[683 NYS2d 557]

Alexander G. Lunney, Respondent, v Prodigy Services Company, Appellant, et al., Defendants.

Second Department, December 28, 1998

**APPEARANCES OF COUNSEL**

*Phillips Nizer Benjamin Krim & Ballon, L. L. P.,* New York City (*Michael J. Silverberg* and *Bruce J. Turkle* of counsel), for appellant.

*Lunney & Murtagh, L. L. C.,* White Plains (*J. Robert Lunney* and *Phillip C. Landrigan* of counsel), for respondent.

**OPINION OF THE COURT**

BRACKEN, J. P.

Some infantile practical joker with access to a computer sent an offensive electronic message (hereinafter e-mail) to a Boy Scout leader, infusing the text of the message with threats more likely to perplex than actually to intimidate an adult recipient. The intended victim of this prank appears to be less the Boy Scout leader himself than the plaintiff, Alex G. Lunney, who was then a 15-year-old prospective Eagle Scout, and whose name appeared as the signatory and author of the e-mail message in question. The charade was, as they say, crude but effective, in that the plaintiff was initially suspected of having sent the threatening piece of electronic correspondence. The plaintiff now seeks money damages as compensation for the emotional distress which he consequently suffered, not from the originator of this lowbrow practical joke, but instead from Prodigy Services Company (hereinafter Prodigy), the company which in effect furnished the medium through which the offensive message was sent. Applying a privilege recognized by the common law of this State, and historically afforded to telegraph companies (*see, Anderson v New York Tel. Co.,* 35 NY2d 746, *revg* 42 AD2d 151 *on dissent of Witmer, J.*), we conclude that Prodigy is entitled to summary judgment.

## I

According to the plaintiff's original complaint, on September 9, 1994, defendant "John Doe I", using identification number

EGYD83A, accessed the "Prodigy Network" and posted a "vile and obscene" e-mail message in the name of the plaintiff.

The Boy Scout leader who received the e-mail reported the matter to the Bronxville police and to the plaintiff's Scout Master. The latter "confronted [the] plaintiff, at his home, in the presence of his mother * * * and demanded an explanation". There is no evidence that the police took any action against the plaintiff, or that he was disciplined in any way by the Boy Scout authorities. It therefore appears that the plaintiff's denial of any involvement in the transmission of this message was accepted at face value.

By letter dated September 14, 1994, a Prodigy representative wrote to the plaintiff advising him that his account had been suspended due to the transmission of "abusive, obscene, and sexually explicit material" for which he was, as of that time, incorrectly presumed to be responsible. In a letter dated September 23, 1994, the plaintiff responded by explaining that he had in fact never subscribed to Prodigy's service, and that anyone who had purported to open an account in his name had done so fraudulently. In a letter dated October 27, 1994, a representative of Prodigy apologized to the plaintiff, and advised him that several fictitious accounts, which had been opened under his name, had been terminated. It appears, in fact, that a Prodigy account can be opened by any person who is willing to represent that he or she is not a minor, and who is in a position to furnish a name, an address, and (at least since October 1994) a valid credit card number for billing.

In his original complaint dated December 22, 1994, the plaintiff demanded compensatory and punitive damages from Prodigy based on three theories: (1) libel per se, (2) negligence, and (3) harassment. The plaintiff also sought to enjoin Prodigy from circulating derogatory or defamatory statements about him. Prodigy served an answer dated February 13, 1995. The plaintiff later sought and obtained leave to serve an amended complaint.

In his amended complaint, the plaintiff expanded his factual allegations in order to encompass two "bulletin board" messages posted with the help of Prodigy's service, dated September 5, 1994 and September 7, 1994, respectively.

The plaintiff also sought to impose liability on Prodigy based on a statement by one of its agents, made in an electronic bookkeeping entry, to the effect that "Alex Lunney * * * is a nonpay disconnect subscriber 143 days delinquent". Similarly, the amended complaint cites a handwritten memo produced by a

Prodigy subcontractor stating, "Alex Lunney has been terminated for cc [credit card] fraud as well as obscene material". The plaintiff claims that these messages were still being transmitted over Prodigy's network, "even months after this action was commenced". The amended complaint includes one cause of action based on libel, one based on negligence, and one based on "harassment/intentional infliction of emotional distress".

For procedural reasons which need not be addressed, Prodigy was allowed to make three successive motions for summary judgment, none of which was addressed on the merits. Prodigy now appeals from the two orders which denied the last two of these motions.

## II

The first and most obvious observation that must be made is that, aside from the two memoranda circulated within Prodigy, the statements complained of by the plaintiff do not immediately appear to be defamatory. We are in full agreement with the argument of the appellant's counsel that the e-mail and the bulletin board messages referred to above, although they purport to have been written by the plaintiff, are clearly not "of or concerning" the plaintiff. As counsel argues, these messages might indirectly lead a reader to conclude that the respondent is a "foul-mouthed teenager". At most, one could read into the e-mail message in question a statement of fact to the effect that the plaintiff is a bully who has threatened to sodomize a Scout leader's sons. Assuming that such a statement would indeed be defamatory, we conclude that Prodigy cannot be held legally responsible for it, nor for the allegedly defamatory bulletin board postings, because (1) Prodigy did not publish the statement, and (2) even if Prodigy could be considered a publisher of the statement, a qualified privilege protects it from any liability given the absence of proof that Prodigy knew such a statement would be false.

The rule of common law, as it originally developed in New York, was that, "[h]e who furnishes the means of convenient circulation, knowing, or having reasonable cause to believe, that it is to be used for that purpose, if it is in fact so used, is guilty of aiding in the publication and becomes the instrument of the libeler" (*Youmans v Smith,* 153 NY 214, 218-219). Taken to its extreme, this rule would render Xerox Corporation liable for the damages caused by the reproduction of a libelous document on one of its leased machines, or International Business

Machines Corporation liable for the damages caused by the composition of a libelous document on one of its leased typewriters, at least if such corporate defendants had "cause to believe" that such libelous activities might occur. Subsequent authority makes it clear beyond dispute, however, that no potential for such liability exists, unless the defendant in question has some "editorial or at least participatory function" in connection with the dissemination of the defamatory material (*Anderson v New York Tel. Co.,* 35 NY2d 746, 750, *supra* [Gabrielli, J., concurring]). Here, the record establishes to our satisfaction that Prodigy had no participatory function in connection with the dissemination of the offensive e-mail and bulletin board postings under review.

The key case on this point, *Anderson v New York Tel. Co.* (35 NY2d 746, *supra*), was decided well before the advent of personal computers. However, the legal analysis adopted by the Court of Appeals in that case is as persuasive in the case of written text sent over telephone lines, which is the essential nature of "e-mail" and bulletin board postings, as it was in the case of spoken or recorded messages sent over telephone lines, which is the type of communication the *Anderson* case involved.

The case of *Anderson v New York Tel. (supra)* involved the lessee of telephone equipment which enabled him to play, to whomever happened to call either of two telephone numbers, a recorded message containing accusations of misconduct against the plaintiff, the Presiding Bishop of the Church of God in Christ of Western New York. The lessee also had access to a weekly radio program, which he exploited in order to encourage the public to call the two phone numbers containing the scurrilous message. The accusations against the Bishop included allegations that he fathered illegitimate children. The Bishop, understandably upset, sued the telephone company. The Court of Appeals, adopting the opinion of the dissenter in the Appellate Division, held that the Bishop had no cause of action.

The similarity between the fact pattern now under review and that under review in *Anderson* is evident; however, there is a major distinction which serves only to highlight the lack of merit with respect to the case at hand. In *Anderson,* the defendant telephone company had actually been notified of the improper use to which its equipment was being put. In fact, company employees dialed the numbers and actually listened to the defamatory messages. Nevertheless, the telephone company did nothing to stop the messages, despite the Bishop's repeated requests.

In *Anderson,* the dissenting opinion of Justice Witmer, adopted by the Court of Appeals, initially drew a distinction between telegraph companies, which may be considered to have published the messages submitted to them by telegraph senders, on the one hand, and telephone companies, which may not properly be considered publishers, on the other. As stated in Justice Witmer's opinion, a telegram is sent only "through the direct participation of agents of the telegraph company" whereas, "[i]n the case of a modern-day *telephone* call * * * the caller communicates directly with the listener over the facilities of the telephone company, with no publication by the company itself" (*Anderson v New York Tel. Co.,* 42 AD2d, *supra,* at 163 [emphasis in original]). The evidence in the present record leads to the conclusion that the role played by Prodigy in connection with the offensive messages sent under the plaintiff's name is, by far, more analogous to that of a telephone company than to that of a telegraph company. Thus, pursuant to the first holding of the Court of Appeals in *Anderson,* we conclude that Prodigy cannot be considered a publisher.

It may be true that Prodigy has devised a method by which certain epithets are automatically excluded from the messages sent via its network. But application of any unintelligent automated word-exclusion program of this type cannot be equated with editorial control. A highly offensive message can be composed in the most impeccable prose, just as the words often thought of as offensive can be used affectionately or humorously in certain contexts. Intelligent editorial control involves the use of judgment, and no computer program has such a capacity. There is certainly no evidence in this record that a human being in the employ of the defendant approved of the transmission of the e-mail or bulletin board messages complained of by the plaintiff. This being the case, Prodigy cannot be considered a publisher of that material.

The *Anderson* case is also authority for the proposition that even if Prodigy could be considered a publisher, it is protected by a qualified privilege. *Anderson* observes that the telephone company is in a purely passive position with respect to the messages sent by one telephone user to another, a position "not legally different from the role played by a person who leases a sound amplification system to a person who makes a defamatory public speech, or who leases a typewriter to one who writes defamatory messages" (*Anderson v New York Tel. Co.,* 42 AD2d, *supra,* at 163 [Witmer, J., dissenting]). *Anderson* further states that, even if the telephone company were the

equivalent of a publisher, it would be protected from liability under the facts presented. This statement was based on the qualified immunity which, at common law, had been accorded to telegraph companies which, due to their employees' participation in the transmission of messages, were considered "publishers" with respect to potential liability based on defamation.

The common law has always recognized a qualified privilege for telegraph companies that transmit defamatory messages submitted by their customers pursuant to which the defendant can be held liable only upon a showing of actual malice, that is, knowledge of the falsity of the message, a showing which a plaintiff will rarely if ever be able to make (*see*, Restatement [Second] of Torts § 612 [2]; *see also, Matter of Figari v New York Tel. Co.,* 32 AD2d 434, 447; *Klein v Western Union Tel. Co.,* 257 App Div 336; *Mason v Western Union Tel. Co.,* 52-Cal App 3d 429, 125 Cal Rptr 53; *Western Union Tel. Co. v Lesesne,* 182 F2d 135; *O'Brien v Western Union Tel. Co.,* 113 F2d 539; *Von Meysenbug v Western Union Tel. Co.,* 54 F Supp 100; Annotation, *Liability of Telegraph or Telephone Company for Transmitting or Permitting Transmission of Libelous or Slanderous Messages,* 91 ALR3d 1015; Sack and Baron, Libel, Slander, and Related Problems § 6.3.1). In *Anderson,* the Court extended that privilege to the telephone company as well.

We are aware, of course, of the decision in *Stratton Oakmont v Prodigy Servs. Co.* (Sup Ct, Suffolk County, May 24, 1995). In that case, the Supreme Court held that Prodigy had been shown to have exercised editorial control over a financial bulletin board to the extent that it could be considered the publisher of a defamatory posting, which contained defamatory statements concerning the plaintiff, and which had been placed on the bulletin board by a third party. For several reasons, *Stratton Oakmont* is not controlling here.

First, it is obvious that the *Stratton Oakmont* rationale would apply, if at all, only to the portion of the plaintiff's amended complaint which related to the bulletin board postings. Whatever editorial control over such postings might have been possible, it is clear from the present record that a service provider such as Prodigy cannot screen all of the e-mail sent by its subscribers.

Second, the evidence in the record in *Stratton Oakmont* describes the efforts at editorial control which, according to the evidence in the present record, Prodigy in fact abandoned in January 1994, prior to the events underlying the present com-

plaint. Thus, the decision in *Stratton Oakmont* was made in an entirely different factual context.

Third, the *Anderson* decision, discussed at length above, states that a telecommunications company can be considered a publisher of those messages in whose transmission it actually participates. It does not hold that such a company, if it were to participate in the formulation of the text of one or two messages, would thereupon expose itself to liability based on the text contained in the millions of other messages in whose transmission it did not participate. It is, in other words, irrelevant if Prodigy, in the case at hand, is shown to have exercised the power to exclude certain vulgarities from the text of certain messages. What matters is that there is no proof that any such control was exercised in connection with the transmission of the messages complained of by the plaintiff.

Fourth, as outlined above, the *Anderson* case establishes the rule that even a telecommunications company which in some measure participates in the transmission of a libelous message cannot be held liable unless it knew that the message was in fact libelous, a circumstance which will rarely, if ever, be proved. The common-law privilege which benefits telegraph companies must apply to internet service providers as well. E-mail is, in substance, nothing but an updated version of the telegraph.

Our disagreement with the holding in *Stratton Oakmont* is not only compelled by our understanding of the holding of the Court of Appeals in *Anderson,* but is also dictated by at least one simple consideration of fairness. The *Stratton Oakmont* court itself acknowledged that a purely passive on-line service provider would face no liability based on the transmission of defamatory material through its services. Liability was imposed on Prodigy in that case solely because Prodigy had attempted, to some extent, to control the text of the various messages placed on its bulletin boards. The *Stratton Oakmont* holding "appear[s] to encourage systems operators to ignore the content on their bulletin boards in order to attain the much-preferred 'distributor' status" (Sanford, Libel and Privacy § 8.4.10 [2d ed]). Thus, in *Stratton Oakmont* Prodigy was punished for allegedly performing in an inadequate way the very conduct (exercise of editorial control) which, initially, it had no legal duty to perform at all. The rule of law announced in *Stratton Oakmont* discourages the very conduct which the plaintiff in *Stratton Oakmont* argued should be encouraged.

The plaintiff in this case argues that Prodigy exposed itself to tort liability by parties with whom it had no contractual re-

lationship when it allegedly failed to adhere to the commitments it made to its subscribers in its Service Member Agreement (hereinafter the agreement). This argument fails for several reasons. Most basically, the text of this agreement actually provides that "Prodigy reserves the right (*but is not obligated*) to review and edit any material submitted for display" (emphasis added). This provision negates any possible extension of tort liability to third parties based on any alleged failure, on the part of Prodigy, to monitor its bulletin boards.

Our application of the holding of the Court of Appeals in *Anderson* results in our being in complete harmony with the expanding body of case law which supports the general proposition that an on-line service company such as Prodigy is not liable for damages when its services are misused by a third party who transmits an offensive or libelous text. In *Cubby, Inc. v CompuServe, Inc.* (776 F Supp 135 [SD NY]), for example, the court held that the defendant, another on-line service provider, was not liable for the posting of a defamatory notice on an electronic bulletin board. The court stated, "CompuServe has no more editorial control over such a publication than does a public library, book store, or newsstand, and it would be no more feasible for CompuServe to examine every publication it carries for potentially defamatory statements than it would be for any other distributor to do so" (*Cubby, Inc. v CompuServe, Inc., supra,* at 140; *see also, Doe v America Online,* 718 So 2d 385 [Fla]; *Zeran v America Online,* 958 F Supp 1124, *affd* 129 F3d 327, *cert denied* — US —, 118 S Ct 2341; *Blumenthal v Drudge,* 992 F Supp 44).

Our application of the common-law qualified privilege recognized in *Anderson* also renders the outcome in this case in complete harmony with current Federal statutory law contained in the Communications Decency Act of 1996 (47 USC § 230). We need not decide what is thus the essentially academic question of whether this Federal statute would apply to all or part of the allegations of the plaintiff's amended complaint.

Finally, we note that the internal Prodigy memoranda are shielded by the common interest privilege, and that there is no proof of actual malice in this respect (*see, Liberman v Gelstein,* 80 NY2d 429). The remaining theories upon which the plaintiff proposes to impose liability on Prodigy are patently meritless.

### III

For the foregoing reasons, the order entered January 14, 1998 is reversed, on the law, and Prodigy's motion for sum-

mary judgment is granted. The appeal from the order entered July 2, 1997 is dismissed as academic in light of this determination.

MILLER, O'BRIEN and FRIEDMANN, JJ., concur.

Ordered that the order entered January 14, 1998 is reversed, on the law, the defendant's motion for summary judgment is granted, the amended complaint insofar as asserted against the appellant is dismissed, and the action against the remaining defendants is severed; and it is further,

Ordered that the appeal from the order entered July 2, 1997 is dismissed as academic in light of our determination of the appeal from the order entered January 14, 1998; and it is further,

Ordered that the appellant is awarded one bill of costs.