OPINION OF THE COURT
 

 Rosenblatt, J.
 

 Usurping the name of Alexander Lunney (a teenage Boy Scout and infant plaintiff in this appeal), an unknown imposter opened a number of accounts with Prodigy Services Company (Prodigy), an Internet Service Provider (ISP). The imposter posted two vulgar messages in Lunney’s name on a Prodigy bulletin board and sent a threatening, profane electronic mail (e-mail) message in Lunney’s name to a third person. Lunney, by his father, has sued Prodigy, asserting that he has been stigmatized by being falsely cast as the author of these messages.
 
 [1]
 
 The principal issues before us are whether, under these circumstances, Prodigy may be held liable for defamation or negligence. For the reasons that follow, we hold that the complaint against Prodigy was properly dismissed.
 

 I. Background
 

 On September 9, 1994, after opening several membership accounts with Prodigy under slightly different variants of the
 
 *247
 
 name Alex or Alexander Lunney, the imposter transmitted an e-mail message, under Lunney’s name, to a local scoutmaster. The subject line of the message read “how i’m gonna’kill u”; the body was vulgar in the extreme. After receiving the e-mail, the scoutmaster alerted the Bronxville police, as well as Lunney’s scoutmaster. They investigated the matter, and readily accepted Lunney’s denial of authorship, and his innocence in this episode.
 

 While the investigation was afoot, Prodigy, by letter dated September 14, 1994, notified Lunney that it was terminating one of the named accounts “due to the transmission of obscene, abusive, threatening, and sexually explicit material through the Prodigy service and providing inaccurate profile information.” Lunney, for his part, advised Prodigy that it was an imposter who, without authority, had opened the account and sent the message. Prodigy apologized to Lunney and also informed him that it had uncovered four more Alexander Lunney accounts and closed them all within two days after they were opened.
 

 Lunney sued Prodigy, claiming, in essence, that Prodigy was derelict in allowing the accounts to be opened in his name, and was responsible for his having been stigmatized and defamed. During discovery Prodigy located and produced two additional vulgar messages that appeared on its electronic bulletin board with Alexander Lunney’s name as sender dated September 5, 1994 and September 7, 1994. Prodigy also produced two internal memoranda pertaining to Prodigy’s initial reasons for terminating the “Alexander Lunney” accounts before learning that they had been opened by an unauthorized imposter.
 
 [2]
 

 Supreme Court denied Prodigy’s three motions for summary judgment. On a consolidated appeal from the denial of the second and third motions, the Appellate Division reversed and granted summary judgment to Prodigy, holding that (i) the messages were not “of and concerning” Lunney and therefore did not defame him, (ii) although the messages were in extremely poor taste, the stigma associated with them did not amount to defamation and (iii) Prodigy was not the publisher of the messages, but even if it could be so considered, it was entitled to a qualified privilege sheltering it from liability
 
 (see, Lunney v Prodigy Servs. Co.,
 
 250 AD2d 230, 233). We granted Lunney leave to appeal to this Court.
 

 
 *248
 
 II. Analysis
 

 As a threshold matter there is the question of whether the messages were defamatory. The Appellate Division expressed doubt on the point, considering that defamation cases most typically involve communications that directly impugn the plaintiff. Here, the messages were not about the plaintiff, but were ascribed to him. In
 
 Ben-Oliel v Press Publ. Co.
 
 (251 NY 250), this Court held that a scholar stated a cause of action for libel based on the publication of a flawed article written by someone else, but improperly attributed to her
 
 (see also, Clevenger v Baker Voorhis & Co.,
 
 8 NY2d 187). For purposes of this opinion we will assume that although he was not directly attacked, Lunney was defamed by being portrayed as the author of the foul material.
 

 In a thoughtful opinion by Justice Bracken, the Appellate Division went on to hold that even if the material was “defamatory” Prodigy is protected by the common-law privilege recognized in
 
 Anderson v New York Tel. Co.
 
 (35 NY2d 746). We agree with the Appellate Division’s analysis and conclude that in the case before us the common-law privilege should apply.
 

 The E-Mail Message
 

 We turn first to Lunney’s claim stemming from the e-mail message. E-mail is the day’s evolutionary hybrid of traditional telephone line communications and regular postal service mail.
 
 [3]
 
 As one commentator explained, “[t]o transmit a message, one must have access to an on-line service’s e-mail system and must know the recipient’s personal e-mail address”
 
 (see,
 
 Luftman, Note,
 
 Defamation Liability for On-Line Services: The Sky is Not Falling,
 
 65 Geo Wash L Rev 1071, 1081 [1997]). Once this is accomplished, a person may communicate by composing a message in the e-mail computer system and dispatching it telephonically (or through some other dedicated electronic line) to one or more recipients’ electronic mailboxes. A recipient may forward the message or reply in like manner. Commercial online services, such as Prodigy, transmit the private e-mail messages but do not exercise any editorial control over them (see, Luftman,
 
 op. cit.).
 

 Because Lunney’s defamation action is grounded in New York common law, we evaluate it in accordance with our
 
 *249
 
 established tort principles (see,
 
 Foster v Churchill,
 
 87 NY2d 744, 751-752;
 
 Liberman v Gelstein,
 
 80 NY2d 429, 434). Although they were fashioned long before the advent of e-mail, these settled doctrines accommodate the technology comfortably, and with apt analogies (see
 
 generally,
 
 Miranda,
 
 Defamation in Cyberspace: Stratton Oakmont, Inc. v Prodigy Services Co.,
 
 5 Alb L J Sci & Tech 229, 237 [1996]).
 

 In
 
 Anderson v New York Tel. Co.,
 
 this Court was asked to determine whether a telephone company could be held liable as a publisher of a scurrilous message that a third party recorded and made available to the public by inviting anyone interested to dial in and listen (35 NY2d 746,
 
 supra).
 
 The Court adopted the opinion of Justice Witmer in his dissent at the Appellate Division, concluding that the telephone company could not be considered a publisher, because in “no sense has * * * [it] participated in preparing the message, exercised any discretion or control over its communication, or in any way assumed responsibility” (42 AD2d 151, 163).
 
 Anderson
 
 also holds that even if the telephone company could be counted as a publisher, it would be entitled to a qualified privilege subject to the common-law exception for malice or bad faith (42 AD2d, at 163-164).
 

 Anderson
 
 emphasized the distinction between a telegraph company (in which publication may be said to have occurred through the direct participation of agents) and a telephone company, which, as far as content is concerned, plays only a passive role. The
 
 Anderson
 
 doctrine parallels the case before us. Prodigy’s role in transmitting e-mail is akin to that of a telephone company, which one neither wants nor expects to superintend the content of its subscribers’ conversations. In this respect, an ISP, like a telephone company, is merely a conduit. Thus, we conclude that under the decisional law of this State, Prodigy was not a publisher of the e-mail transmitted through its system by a third party.
 

 Moreover, we are unwilling to deny Prodigy the common-law qualified privilege accorded to telephone and telegraph companies. The public would not be well served by compelling an ISP to examine and screen millions of e-mail communications, on pain of liability for defamation. Considering that in the case before us there is no basis upon which to defeat the qualified privilege, it should and does apply here.
 

 The Prodigy Bulletin Board Messages
 

 As distinguished from e-mail communication, there are more complicated legal questions associated with electronic bulletin
 
 *250
 
 board messages, owing to the generally greater level of cognizance that their operators can have over them. One commentator defines an electronic bulletin board as “storage media, e.g., computer memories or hard disks, connected to telephone lines via devices known as modems and controlled by a computer”
 
 (see,
 
 Segal, Comment,
 
 Dissemination of Digitized Music on the Internet: A Challenge to the Copyright Act,
 
 12 Santa Clara Computer & High Tech L J 97, 103, n 21 [1996]). In some instances, an electronic bulletin board could be made to resemble a newspaper’s editorial page; in others it may function more like a “chat room.”
 
 [4]
 
 In many respects, an ISP bulletin board may serve much the same purpose as its ancestral version, but uses electronics in place of plywood and thumbtacks. Some electronic bulletin boards post messages instantly and automatically, others briefly delay posting so as not to become “chat rooms,” while still others significantly delay posting to allow their operators an opportunity to edit the message or refuse posting altogether
 
 (see,
 
 Sheridan,
 
 Zeran v AOL and the Effect of Section 230 of the Communications Decency Act Upon Liability for Defamation on the Internet,
 
 61 Alb L Rev 147, 152-153 [1997]).
 

 Lunney argues that because Prodigy, in its membership agreements, reserves for itself broad editorial discretion to screen its bulletin board messages, it should be liable as a publisher of such messages. Prodigy, on the other hand, argues that while it reserves the right to screen its bulletin board messages, it is not required to do so, does not normally do so and therefore cannot be a publisher of electronic bulletin board messages posted on its system by third parties.
 

 The Appellate Division aptly concluded that even if Prodigy “exercised the power to exclude certain vulgarities from the text of certain [bulletin board] messages,” this would not alter its passive character in “the millions of other messages in ■ whose transmission it did not participate” (250 AD2d, at 237), nor would this, in our opinion, compel it to guarantee the content of those myriad messages. We agree with the Appellate Division in its conclusion that, in this case, Prodigy was not a publisher of the electronic bulletin board messages. We see no occasion to hypothesize whether there may be other in
 
 *251
 
 stances in which the role of an electronic bulletin board operator would qualify it as a publisher.
 

 III. Other Issues
 

 Negligence
 

 Lunney contends that Prodigy was negligent in failing to employ safeguards to prevent the imposter from opening the accounts in question. He would require an ISP to employ a “process for verification of the bona tides” of all applicants and any credit cards they offer so as to protect against defamatory acts. Prodigy contends that such a duty would require an ISP to perform investigations on millions of potential subscribers, so as to be guarantors against harmful transmissions. The rule plaintiff advocates would, in cases such as this, open an ISP to liability for the wrongful acts of countless potential tortfeasors committed against countless potential victims. There is no justification for such a limitless field of liability
 
 (Pulka v Edelman,
 
 40 NY2d 781). If circumstances could be imagined in which an ISP would be liable for consequences that flow from the opening of false accounts, they do not present themselves here.
 

 Communications Decency Act
 

 The parties have disagreed over the applicability of the Communications Decency Act (47 USC § 230) (CDA) and the merits of
 
 Zeran v America Online
 
 (129 F3d 327 [4th Cir 1997],
 
 cert denied
 
 524 US 937). Prodigy has contended that the CDA should govern this case by retroactive application. It asks us to interpret the CDA to render an ISP unconditionally free from notice-based liability, insofar as the statute has been interpreted as granting Federal immunity from “lawsuits seeking to hold a service provider liable for its exercise of a publisher’s traditional editorial functions — such as deciding whether to publish, withdraw, postpone or alter content”
 
 (see, Zeran v America Online,
 
 129 F3d, at 330,
 
 supra).
 
 At this point we decline the invitation to come down on either side of this debate.
 
 [5]
 
 This case does not call for it.
 

 We recognize of course that parties to a lawsuit, and surely others interested in the field, will look to decisions for points of
 
 *252
 
 guidance. For every new rule that a court sets down doubts are minimized, and practitioners are able to give counsel based on settled doctrine, rather than on open questions. While many decisions serve to establish rules that advance predictability, courts cannot go beyond the issues necessary to decide the case at hand. An ambition of that sort would entail something very much like drafting advisory opinions. Misdirected or misapplied, they can create the very kind of uncertainty, or confusion, that purposeful decisional law seeks to eliminate. These general observations apply even more compellingly when dealing with Internet law. Given the extraordinarily rapid growth of this technology and its developments, it is plainly unwise to lurch prematurely into emerging issues, given a record that does not at all lend itself to their determination.
 

 We have considered Lunney’s remaining causes of action against Prodigy and find them to be without merit.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Smith, Levine, Ciparick and Wesley concur; Judge Bellacosa taking no part.
 

 Order affirmed, with costs.
 

 [1]
 

 . Because this suit was commenced when Alexander Lunney was a minor, the action was brought in his name, by his father, J. Robert Lunney. Unless otherwise stated, “Lunney” refers to Alexander Lunney. Initially, Lunney named “John Doe,” the unknown imposter, as a co-defendant, but that claim has been abandoned, and the case has proceeded only against Prodigy.
 

 [2]
 

 . Lunney sought and was granted permission to amend his complaint to add claims against Prodigy based on the Prodigy bulletin board messages and the internal memoranda.
 

 [3]
 

 . Now known colloquially as “snail mail” judging by its comparative speed (see,
 
 e.g.,
 
 Salbu,
 
 Who Should Govern the Internet?: Monitoring and Supporting a New Frontier,
 
 11 Harv J Law & Tech 429, 471-472 [1998]).
 

 [4]
 

 . “Chat rooms” have been defined as services that allow multiple users “to ‘talk’ through simultaneous text postings” (see, Barrett, Note,
 
 The Law of Diminishing Privacy Rights: Encryption Escrow and the Dilution of Associational Freedoms in Cyberspace,
 
 15 NYL Sch J Hum Rts 115,117, n 14 [1998]).
 

 [5]
 

 .
 
 E.g.,
 
 Pantazis, Note,
 
 Zeran v America Online, Inc.: Insulating Internet Service Providers From Defamation Liability,
 
 34 Wake Forest L Rev 531 (1999); Wiener, Comment,
 
 Negligent Publication of Statements Posted on Electronic Bulletin Boards: Is There Any Liability Left After Zeran?,
 
 39 Santa
 
 *252
 
 Clara L Rev 905 (1999); Boehm, Note,
 
 A Brave New World of Free Speech: Should Interactive Computer Service Providers Be Held Liable for the Material They Disseminate?,
 
 5 Rich JL & Tech 7 (1998); Slitt, Note,
 
 The Anonymous Publisher: Defamation on the Internet After Reno v American Civil Liberties Union and Zeran v America Online,
 
 31 Conn L Rev 389 (1998); Sheridan,
 
 Zeran v AOL and the Effect of Section 230 of the Communications Decency Act Upon Liability for Defamation on the Internet,
 
 61 Alb L Rev 147 (1997).