OPINION OF THE COURT
Francis T. Collins, J.
The motion of the defendant for an order pursuant to CPLR 3212 dismissing the claim as time barred pursuant to CPLR 215 is granted.
Claimant was employed by the Department of Environmental Conservation (DEC) from October 29, 1964 to January 31, 1997 and during the last 13 years of his employment held the position of Director of the Division of Law Enforcement (DLE). DEC is the agency charged by ECL 3-0301 (1) to “carry out the environmental policy of the state” which is “to conserve, improve and protect its natural resources and environment and control water, land and air pollution, in order to enhance the health, safety and welfare of the people of the state and their overall economic and social well being” (ECL 1-0101 [1]). The DLE is comprised of approximately 300 members charged with the responsibility of enforcing the Environmental Conservation Law. DEC divides the State into nine regions within which the members of DLE are deployed. Each region has a DLE office staffed by a captain, a lieutenant, and, in some cases, an environmental conservation officer (ECO). Most ECOs work out of their homes and are assigned to patrol specific areas. In the course of discharging their responsibilities, ECOs are often called upon to kill wildlife and to make arrests for violations of the Environmental Conservation Law. From 1981 to 1990, DLE members were armed with Smith & Wesson .357 magnum revolvers. During the late 1980s, claimant recommended to his superiors at DEC that the members of DLE be equipped with 9 mm. semi-automatic pistols in place of the Smith & Wesson revolvers.
The recommendation was approved and in January of 1990, through the New York State Office of General Services, DEC invited bids for 9 mm. semi-automatic pistols. Northeast Gun & Supply Co., Inc. (Northeast) submitted the winning bid and entered into a contract to supply 305 Glock Model 17 semiautomatic 9 mm. pistols at a cost of $315.77 per weapon and to accept 333 Smith & Wesson or Colt revolvers as trade-ins together with other miscellaneous weapons and equipment. Thereafter, the number of guns to be supplied was modified to *107 267 Glock Model 17 pistols and 59 Glock Model 19 pistols. At some point, a practice was instituted by which DLE officers were permitted to purchase the revolvers from Northeast at the trade-in price. Weapons purchased through this arrangement were to be owned personally by the purchasing officer. A total of 112 guns were bought back by 78 DLE officers.
During 1993, DEC decided to upgrade the 9 mm. Glock pistols to .40 caliber Glock pistols and bids were once again solicited through the Office of General Services. Glock, Inc., the manufacturer of Glock weapons, was the winning bidder at a price of $314.70 per weapon for 264 Glock Model 22s and 62 Glock Model 23s. The contract again contained a trade-in provision for the 326 used 9 mm. Glock pistols that had been purchased in 1990. Again, DLE officers were given the option of purchasing the used 9 mm. pistols at the trade-in price and 325 pistols were purchased by officers rather than being sent to Glock. Claimant purchased five of those pistols, in addition to a revolver he had purchased during the 1990 trade-in process.
Section 6 of the Executive Law authorizes the Governor or any one or more persons appointed by him to investigate “the management and affairs of any department, board, bureau or commission of the state.” Pursuant to that authority, Governor Pataki and his predecessors issued executive orders forming the Office of the State Inspector General within the Executive Department (see, Executive Order No. 39, dated June 17, 1996). The State Inspector General is appointed by and serves at the pleasure of the Governor and employs a staff of attorneys, investigators and support personnel to perform its assigned function of investigating State agencies. The Inspector General is charged with the duties of investigating complaints from any source, or upon his or her own initiative, concerning allegations of fraud, conflicts of interest, corruption or criminal activity in any covered agency, issuing written public reports of such investigations and recommending remedial actions to eliminate such practices.
During May of 1992, Investigator Charles R. Norfleet of the Office of the Inspector General was assigned to investigate an alleged theft of DEC property, including a DEC pistol. The inquiry subsequently expanded into an investigation of the 1990 and 1993 pistol purchases by DEC and the manner in which the trade-in and buy-back of used weapons was undertaken. At a press conference held on December 16, 1996, the Inspector General issued a report entitled “The Best Bang for Their *108 Buck” (the Report) which was highly critical of claimant’s management style and procurement of weapons. On March 3, 1997, the Attorney General received a notice of intention to file a claim alleging that the defendant libeled, slandered and defamed claimant through the publication of the following statements contained in the Report:
“[Firth] knowingly tolerated repeated breaches of law and policy. The citizens of this state demand of our law enforcement officers the highest degree of integrity, honesty and trustworthiness * * * George Firth fall [s] short in every category * ^ *
“the 1990 and 1993 weapons transactions [were] fraught with violations of law. This misconduct, committed by Director George Firth and other members of LED, raises disturbing questions concerning the fitness of these individuals to perform their duties as law enforcement officers * * * Their lack of responsibility and disregard for the law call into question their ability to serve this state as police officers.”
On March 18, 1998, claimant filed a claim alleging that he was defamed by the two portions of the Report quoted above, both at the time of the initial publication and thereafter through daily republication upon the Internet. The first cause of action seeks to recover the sum of $2,500,000 upon a defamation theory due to the alleged injury to claimant’s reputation in the Capital District. The second cause of action seeks $2,500,000 alleging that defendant’s publication of defamatory statements upon the Internet has impugned his reputation worldwide and prevented him from securing new employment within the law enforcement community. The third cause of action seeks $5,000,000 in punitive damages.
The third cause of action is quickly disposed of as the law is settled that there is not a separate cause of action for punitive damages. That element of relief is available only as a part of some other underlying cause of action (APS Food Sys. v Ward Foods, 70 AD2d 483). More importantly, the Court of Appeals has held that the waiver of sovereign immunity set forth in the Court of Claims Act does not authorize punitive damages to be assessed against the State (Sharapata v Town of Islip, 56 NY2d 332). Therefore, the third cause of action set forth in the claim must be dismissed for failure to state a cause of action, and for lack of subject matter jurisdiction.
As to the timeliness issue, Court of Claims Act § 10 (3-b) provides, in pertinent part, as follows: “3-b. A claim to recover damages for injuries to property or for personal injuries caused *109 by the intentional tort of an officer or employee of the state * * * shall be filed and served upon the attorney general within ninety days after the accrual of such claim, unless the claimant shall within such time serve upon the attorney general a written notice of intention to file a claim therefor, in which event the claim shall be filed and served upon the attorney general within one year after the accrual of such claim.”
Apparent from the above is that when a claimant serves a notice of intention to file a claim asserting an intentional tort cause of action, such as defamation, the claim itself must be filed within one year of the accrual of the claim. The failure to comply with a time limitation set forth in Court of Claims Act § 10 deprives this court of jurisdiction to decide the claim (State of New York v Dewey, 260 AD2d 924) if the defect is raised with sufficient particularity by motion or in the answer (Court of Claims Act § 11 [c]). If the failure to comply with the service or filing requirement of the Act is not raised with sufficient specificity it is waived (Fowles v State of New York, 152 Misc 2d 837, 839). To be adequately specific, the affirmative defense must at the very least inform the claimant “that the claim or notice of intention was not filed or served in a timely fashion” and “that the claim should have been filed at some earlier time” (Sinacore v State of New York, 176 Misc 2d 1, 9).
In this case, a notice of intention was received (the date of receipt is the dispositive date [Mallory v State of New York, 196 AD2d 925, 926]) by the Attorney General on March 3, 1997, a date within 90 days of the publication of “The Best Bang for Their Buck” on December 16, 1996. Thus, the notice of intention was timely served. However, pursuant to Court of Claims Act § 10 (3-b) any claim with respect to that notice of intention was required to be served and filed within one year of December 16, 1996 in order to be timely. The claim herein was received by the Attorney General on March 16, 1998 and filed with the Clerk of the Court on March 18, 1998. Thus, it would appear that the claim was not timely served and filed unless waived by the defendant’s failure to plead the defense with particularity.
The answer does not contain an affirmative defense* alleging a failure to serve and file the claim within one year of accrual as required by Court of Claims Act § 10 (3-b). Thus, the defen *110 dant has waived its right to assert a defense based upon the claimant’s failure to comply with the requirements of Court of Claims Act § 10 (3-b). However, that is not the end of the timeliness issue as CPLR 215 (3) provides that a cause of action for libel and slander must be commenced within one year of accrual. In the case of Trayer v State of New York (90 AD2d 263, 268), the Third Department held: “Accordingly, we hold that those seeking to sue the State for intentional torts committed by State officers or employees must, in addition to meeting the jurisdictional time limits contained in subdivision 3 of section 10 of the Court of Claims Act, comply with CPLR 215 (subd 3) or risk having their claim dismissed if a timely Statute of Limitations defense is raised.”
The above holding establishes that a claimant asserting an intentional tort claim against the State must meet both the time limitations contained in Court of Claims Act § 10 (3-b), if they have not been waived as they have here, and CPLR 215 (3). Although Trayer (supra) was decided prior to the 1985 enactment adding subdivision (3-b) to section 10 of the Court of Claims Act (L 1985, ch 645) which reduced the time to serve and file a claim asserting an intentional tort from two years to one year, its analysis determining that a claimant asserting an intentional tort cause of action in the Court of Claims must comply with the Statute of Limitations set forth in CPLR 215 (3) or risk having his or her claim dismissed pursuant to a timely defense remains good law. As a result, any claim asserting a cause of action encompassed within CPLR 215 (3) must be dismissed if not commenced within one year of accrual if the Statute of Limitations defense is properly pleaded in the answer (as it is here in the fifth affirmative defense [see, Immediate v St. John’s Queens Hosp., 48 NY2d 671]).
Claimant makes two arguments in support of his position that the claim is timely. Both arguments are based upon the fact that subsequent to the release of the Report at the press conference on December 16, 1996 the Inspector General caused the Report to be placed upon the Internet where to this day it remains available to the public. Indeed, at paragraph 32 of the claim it is alleged that by “publishing initially and republishing each and every day since then on the Internet the defamatory, libelous and slanderous statements cited above, Defendant has injured and continues to injure my reputation generally throughout the community in which I reside, the capital district area.” Likewise, paragraph 35 states that, “[b]y publishing initially and republishing each and every day since *111 then on the internet the defamatory, libelous and slanderous statements cited above, Defendant has injured and continues to injure my reputation generally throughout the community in which I have spent my career, the law enforcement community particularly of the United States and Canada, but more widely of the entire world.” Claimant argues, at page 8 of his memorandum of law, as follows:
“This Claim clearly asserted defamation by virtue of Internet publication as well as paper publication. Thus, at the very least, this Claim is valid as to 90 days of Internet publication through and including the day that the Claim was filed and may not be dismissed as time-barred for that period.
“Moreover, the defamation has been continuous. As a consequence, the Claim — indeed, even the Notice of Intention to File Claim — may be filed at any time within 90 days following the State’s ceasing to publish the defamatory Report.”
Claimant’s argument asserting that the ongoing availability of the Report via the Internet constitutes a continuing wrong is without merit. In Mahoney v Temporary Commn. of Investigation (165 AD2d 233), the claimants were investigated by the Temporary Commission of Investigation of the State of New York and claimed that they were defamed by a final report issued by the Commission. Claimants served and filed a claim alleging various causes of action, including defamation, with respect to events that occurred during the course of the investigation and culminated in the issuance of the report. The State moved to dismiss all of the causes of action with respect to conduct that occurred more than 90 days prior to the filing of the claim. The lower court denied the. motion, and the Appellate Division, in affirming, stated (at 240-241) as follows: “The Court of Claims found the wrongs to be of a continuing nature and so interrelated that they could not be separated for purposes of applying time limitations. We agree. A continuous course of conduct extends the accrual period of a claim until such conduct terminates (Brown v State of New York, 125 AD2d 750, 751-752). Here, acts of the SIC alleged to be wrongful were all a part of the investigation which ended with the issuance of the report. The damages here resulting from the individual acts could not be effectively ascertained and evaluated until the report was released.”
In Mahoney (supra), where it applied the continuing wrong theory to a defamation claim, the Third Department specifically held that the publication of the final report of the investigation signaled the point in time at which the claim ac *112 crued. Here, the Report entitled “The Best Bang for Their Buck” was released to the press on December 16, 1996. Under Mahoney, that is the date upon which the claim accrued. In Selkirk v State of New York (249 AD2d 818, 819), the Third Department specifically rejected the application of the continuing violation doctrine to a claim seeking to set forth a cause of action for defamation upon the holding that “the application of the doctrine * * * may only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct.” Unless each daily appearance of the report upon the Internet constitutes a republication, an issue to be addressed with respect to the discussion of the single publication rule which follows, the defendant’s allegedly wrongful acts consisted of the issuance of the Report on December 16, 1996 and its initial publication upon the Internet on the same date. Any continuing damage to the claimant arising from its availability upon the Internet would simply be a continuing effect of an earlier wrongful act.
Claimant’s final argument is that each day that the article is available upon the Internet constitutes a new publication triggering a new accrual date.
The accrual of a defamation cause of action occurs upon the original publication of the offending material for purposes of computing the running of the one-year Statute of Limitations (Hochberg v Nissen, 180 AD2d 435). Publication occurs when the defamatory work first becomes generally available to the public or is placed on sale (Tomasino v Morrow & Co., 174 AD2d 734), and it “should be noted that this is not the same as the ‘publication date’, a term of art in the publishing industry which refers to a time substantially after the material has been shipped to bookstores and sales are already under way, and when publicity events begin” (Love v Morrow & Co., 193 AD2d 586, 589).
At common law the “multiple publication rule,” first pronounced in Duke of Brunswick v Harmer (14 QB 185, 177 Eng Rep 75), held that a defamatory article is published anew for Statute of Limitations purposes each time a copy of it is delivered to a third person. That rule has been limited in New York through recognition of the “single publication rule” first made applicable to newspapers and magazines (Wolfson v Syracuse Newspapers, 254 App Div 211, affd 279 NY 716), and subsequently to books (Gregoire v Putnam’s Sons, 298 NY 119). In Gregoire, the Court of Appeals (at 123) explained the single publication rule, and the purpose behind it, as follows: *113 “Recognizing that radical changes have been brought about by modern methods of disseminating printed matter for which there is a widespread demand, and desiring to avoid multiplicity of suits and to give effect to statutes of limitation, adjudicated cases disclose that within recent years courts of this State and other jurisdictions have ruled that the publication of a defamatory statement in a single issue of a newspaper, or a single issue of a magazine, although such publication consists of thousands of copies widely distributed, is, in legal effect, one publication which gives rise to one cause of action and that the applicable Statute of Limitation runs from the date of that publication.”
Under the single publication rule, publication occurs at the time the defamatory article is made available to the public and actual sales of the article (the equivalent of “hits” on the Internet) are unnecessary (Tomasino v Morrow & Co., 174 AD2d 734, supra; Sorge v Parade Publs., 20 AD2d 338). A republication will occur when the defamatory article is placed in a new form (paperback as opposed to hardcover) or edited in a different manner (Rinaldi v Viking Penguin, 52 NY2d 422, 434, 435).
The issue becomes whether the single publication rule applies to defamatory publications upon the Internet. Claimant cites the unreported decision of the Court of Appeals of Tennessee in Swafford v Memphis Individual Practice Assn. (1998 WL 281935, 1998 Tenn App LEXIS 361 [Tenn Ct App, June 2, 1998, Lillard, J.]) in support of his argument that the single publication rule should not be applied. Swafford involved false information given to the National Practitioner Data Bank by a health maintenance organization and related health insurance entities concerning Dr. Swafford. The Data Bank operated pursuant to 42 USC § 11131 et seq. and maintained a data base concerning health care providers to which all health care entities were required to report adverse professional reviews. In turn, the adverse information was held confidential and could only be accessed by other health care entities. In a case of first impression, the Tennessee Court of Appeals held that a new cause of action arose for Statute of Limitations purposes each time the defamatory information maintained by the Data Bank was accessed. Based upon the holding of the New York Court of Appeals in Lunney v Prodigy Servs. Co. (94 NY2d 242), the court declines to follow Swafford.
In Lunney (supra), an imposter opened several accounts with Prodigy Services Company (an Internet service provider or *114 ISP) under the plaintiffs name and thereafter posted two vulgar messages attributed to Lunney upon a Prodigy bulletin board accessible by the Internet and sent a threatening e-mail in Lunney’s name to a third person, Lunney sued Prodigy for defamation and negligence. The lower court denied Prodigy’s dismissal motion and the Appellate Division, in reversing, held that Prodigy was protected by the common-law privilege recognized in Anderson v New York Tel. Co. (35 NY2d 746). In Anderson the Court of Appeals had to decide whether a telephone company could be held liable as a publisher for a defamatory message recorded by a third party and made available to any member of the public dialing in. The Court of Appeals held that the telephone company was not a publisher since it did not participate in creating the message or control its distribution. The Court further held that even if deemed a publisher, a telephone company would be entitled to a qualified privilege excusing it from liability in the absence of malice or bad faith.
Although addressed to an issue separate and apart from that requiring determination herein, Lunney (supra) is an important guide in establishing the intellectual framework within which the law will be applied to the unique and rapidly evolving technological advancements centered around the dissemination of information via the Internet. In Lunney the Court of Appeals undertook a comparative analysis in which it examined the mode (e-mail and bulletin board posting) and methodology (use of an'ISP) of dissemination against historical precedents. In so doing, the Court found e-mail to be “the day’s evolutionary hybrid of traditional telephone line communications and regular postal service mail.” Importantly, the Court went on to state: “Because Lunney’s defamation action is grounded in New York common law, we evaluate it in accordance with our established tort principles (see, Foster v Churchill, 87 NY2d 744, 751-752; Liberman v Gelstein, 80 NY2d 429, 434). Although they were fashioned long before the advent of e-mail, these settled doctrines accommodate the technology comfortably, and with apt analogies (see generally, Miranda, Defamation in Cyberspace: Stratton Oakmont, Inc. v Prodigy Services Co., 5 Alb LJ Sci & Tech 229, 237 [1996]).” (Lunney v Prodigy Servs. Co., 94 NY2d, at 248-249.)
Applying existing decisional law to the controversy confronting it the Court affirmed the Appellate Division, equating Prodigy’s role in transmitting the offending e-mail to that of a telephone company which exercises no influence or control over *115 the content of transmitted communications, as opposed to the more active involvement undertaken by a telegraph company which may justify the imposition of liability in a defamation cause of action. A similar analysis was undertaken and a similar result reached with regard to Prodigy’s sponsorship of the bulletin board upon which the offending electronic messages were posted.
Applying established rules of law applicable to the accrual of defamation actions in this State requires a finding that the one-year Statute of Limitations began to run on December 16, 1996, the date of the Report’s original publication and the date when the Report was first made available on the Internet where it has remained unaltered to this date. Concerns regarding the rapid pace of changes in the way information is disseminated, the desire to avoid multiplicity of suits and the need to give effect to relevant Statutes of Limitation which gave rise to the single publication rule enunciated in Gregoire v Putnam’s Sons (298 NY 119, supra) are no less germane today than at the time of the rule’s adoption. This court sees no rational basis upon which to distinguish publication of a book or report through traditional printed media and publication through electronic means by making a copy of the text of the Report available via the Internet. While the act of making the document available constitutes a publication, in the absence of some alteration or change in form its continued availability on the Internet does not constitute a republication acting to begin the Statute of Limitations anew each day.
Applying the single publication rule to the facts of this case requires that the defendant’s dismissal motion be granted.

 The sixth affirmative defense referring to a failure to serve a claim or notice of intention within 90 days of the accrual of the claim is of no value to the defendant as a notice of intention was in fact timely served within 90 days of the accrual date.