5 Cal.Rptr.3d 416 (2003)
112 Cal.App.4th 749
Stephen J. BARRETT et al., Plaintiffs and Appellants,
v.
Ilena ROSENTHAL, Defendant and Respondent.
No. A096451.
Court of Appeal, First District, Division Two.
October 15, 2003.
Rehearing Granted November 10, 2003.
*418 Attorneys for Appellants: Christopher E. Grell, Richard F. Rescho, Ian P. Dillon, Law Offices of Christopher E. Grell, Oakland.
Attorneys for Respondent: Mark Goldowitz, Berkeley, Jesper Rasmussen, San Francisco, California Anti-SLAPP Project.
Attorneys for Amicus Curiae in support of Respondent: Lee Tien, Electronic Frontier Foundation, Ann Brick, American Civil Liberties Union Foundation of Northern California.
Certified for Partial Publication.[*]
Rehearing Granted November 10, 2003. See 9 Cal.Rptr.3d 142.
*417 KLINE, P.J.
Stephen J. Barrett, M.D. and Terry Polevoy, M.D. appeal from the trial court's order striking their complaint for libel, libel per se and conspiracy as a strategic lawsuit against public participation under Code of Civil Procedure section 425.16 *419 (hereafter section 425.16 or the anti-SLAPP statute). They challenge the trial court's findings that the anti-SLAPP statute applies to allegedly libelous statements respondent Ilena Rosenthal caused to be distributed on the Internet, and that appellants could not establish a probability of prevailing on their claims. They also challenge the trial court's award of attorney fees and costs to Rosenthal; its refusal to exempt their attorney from the order directing payment of Rosenthal's attorney fees and costs; and its refusal to allow appellants discovery. We shall reverse the order as it applies to appellant Polevoy and affirm it in all other respects.

BACKGROUND
Appellants Barrett and Polevoy are physicians primarily engaged in combating the promotion and use of "alternative" or "nonstandard" healthcare practices and products. Appellants have allegedly achieved national renown as consumer advocates; each maintains websites that expose "health frauds and quackery" and provide guides for consumers to make intelligent health care decisions. In their writings, appellants attack "products, services and theories that are marketed with claims that [are] false, unsubstantiated, and/or illegal," and their work has assertedly "aroused great concern among promoters of such methods," many of whom believe that destroying appellants' reputations "would increase [the promoters'] success in the marketplace." Although he is an American citizen, appellant Polevoy resides and practices medicine in Canada.
Respondent Rosenthal directs the Humantics Foundation for Women, and participates in two Usenet[1] "newsgroups,"[2] which focus on "alternative medicine." According to appellants, Rosenthal is a particularly active distributor of information via the Internet. During a two-year period ending on May 21, 2001, she assertedly "posted 10,900 messages to newsgroups an average of 15 per calendar day." Appellants contend that one or both *420 of them were mentioned in more than 200 of these messages, all of which were intended to injure their reputations.
Appellants commenced this civil action for damages action against Rosenthal and others,[3] claiming libel, libel per se, and conspiracy. Christopher E. Grell, appellants' attorney at trial and in this court, was also a named plaintiff. On May 31, 2001, Grell moved to dismiss his action as against Rosenthal only, and this dismissal was entered on June 4, 2001.
As the trial court noted, the complaint does not specify which of the several defendants posted the many allegedly libelous online statements it describes, and specifically identifies Rosenthal as the poster of only five such statements, which are the following:
(1) On or about August 14, 2000, Rosenthal commenced distributing on two Usenet newsgroups an e-mail message she received from another defendant, Timothy Bolen. According to the complaint, the message accused Dr. Polevoy of "stalking women" and urged "`health activists ... from around the world' to file complaints to government officials, media organizations, and regulatory agencies." Sample complaints to governmental agencies were also provided. The republished statements claimed Polevoy stalked Christine McPhee, a Canadian radio personality whose program in support of "alternative medicine" he disliked. According to Bolen, Polevoy "terrified" McPhee by e-mailing her the details of his stalking activities. McPhee allegedly sought police protection and "the police kept two uniformed officers on site for some time, to deal with Polevoy." The Bolen statement described Polevoy's conduct as part of a "criminal conspiracy" and urged readers to bring this and other unspecified "criminal" conduct to the attention of various governmental officials, urging them to use their influence to see that "a criminal investigation" of Polevoy's "subversive" activities "begins immediately."[4]
(2) Shortly after she first republished Bolen's message, appellants informed Rosenthal it was false and defamatory, asked that it be withdrawn, and threatened suit if it was not. Rosenthal refused to withdraw the message and, on unspecified dates, posted 32 additional messages on specified Internet newsgroups describing appellants' threat accompanied by a copy of Bolen's allegedly defamatory message and referring to appellants as, among other things, "quacks." The title of these messages *421 contained the words: "Slea[z]y `Quackbuster' Scam."
(3) On June 28, 2000, Rosenthal posted to a specified Internet newsgroup a message referring to Dr. Barrett and "falsely stating that `there are bunches of coming to him to run that PRO-AMA anti alt.med website. PR pays well, and surely he takes in more than $25K per year.'"
(4) On August 18, 2000, Rosenthal posted to a specified newsgroup "a message falsely stating that `Quackwatch appears to be a power-hungry, misguided bunch of pseudoscientific socialist bigots'; is an `industry funded organization'; and is being sued by many doctors and health organizations."
(5) On October 9, 2000, Rosenthal posted to a specified newsgroup a message entitled "Re: Quackbuster Barrett *is* a quackby his own definition," which repeatedly referred to Drs. Barrett and Polevoy as "quacks."
After she answered the complaint, Rosenthal filed a special motion to strike the complaint as to her, claiming it was a "strategic lawsuit against public participation" under section 425.16. In a 27page written order, the trial court granted Rosenthal's motion to strike finding that her publications of the foregoing statements were acts "in furtherance of [her] right of petition or free speech under the United States or California Constitution in connection with a public issue" (§ 425.16, subd. (b)(1)), and therefore covered by the anti-SLAPP statute. The court also determined appellants could not establish a probability of prevailing on their claims, as the statute requires. This latter determination rested on the conclusions that, with one exceptionthe statements alleging that appellant Polevoy had engaged in criminal conductRosenthal's alleged libels were not demonstrably false statements of facts. The trial court also found Rosenthal immune from liability for the reposting of Bolen's statements under section 230 of the Communications Decency Act of 1996 (47 U.S.C. § 230), viewing the statute as protecting her from liability even if the republished charge that Polevoy had engaged in criminal conduct was false and defamatory. Additionally, the court found that appellants could not show that Rosenthal reposted Bolen's statements with actual malice, as they would need to do in order to establish a probability of prevailing on the merits of their defamation claims, because they were both public figures. Finally, the court found that appellants' claims failed because appellants had not produced competent evidence they suffered any actual monetary damage as a result of Rosenthal's publications. The trial court denied appellants' request to conduct discovery for the purpose of producing such evidence.
In the published portion of this opinion we discuss the standard of review (part I), find that the trial court correctly concluded that the anti-SLAPP statute applies to this case (part II), and that appellant Barrett failed to make out a case of defamation, but that it erred in finding appellant Polevoy could not do so due to application of the federal immunity (parts III and III.A). In the unpublished portion we further conclude that the trial court also erred in finding that Polevoy could not prevail because he could not show malice or actual monetary loss (parts III.B & III.C). For these reasons we reverse the order granting the special motion to strike pursuant to section 425.16 insofar as it relates to appellant Polevoy and remand the matter for further proceedings. In the unpublished portion we also determine that it was error to deny appellants' request for discovery as it relates to Polevoy's claim (part IV), affirm the ruling that appellants' counsel was subject to an order *422 requiring payment of attorney fees (part V), and direct the trial court to recalculate the amount of fees respondent is entitled to receive (part VI).

DISCUSSION

I.
Burden of Proof and Standard of Review
Section 425.16 provides, as material, that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) This language necessitates a two-step process for determining whether an action is a SLAPP. (Navellier v. Sletten (2002) 29 Cal.4th 82, 88, 124 Cal.Rptr.2d 530, 52 P.3d 703; Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO (2003) 105 Cal.App.4th 913, 918-919, 130 Cal.Rptr.2d 81.)
In the first step, "the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken `in furtherance of the [defendant] right of petition or free speech under the United States or California Constitution in connection with a public issue'...." (Equilon Enterprises v. Consumer Cause, Inc. (2002) 29 Cal.4th 53, 67, 124 Cal.Rptr.2d 507, 52 P.3d 685.) If the defendant meets this burden, the burden shifts to the plaintiff to demonstrate a probability he or she will prevail on the claim. (Ibid.) "[I]n order to establish the requisite probability of prevailing [citation], the plaintiff need only have `"stated and substantiated a legally sufficient claim."` [Citations.] `Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited."' [Citations.]" (Navellier v. Sletten, supra, 29 Cal.4th at pp. 88-39, 124 Cal.Rptr.2d 530, 52 P.3d 703.)
"Whether section 425.16 applies and whether the plaintiff has shown a probability of prevailing are both reviewed independently on appeal. (Mission Oaks Ranch Ltd. v. County of Santa Barbara (1998) 65 Cal.App.4th 713, 721, 77 Cal. Rptr.2d 1, disapproved on another point in Briggs v. Eden Council for Hope & Opportunity (1999) 19 Cal.4th 1106, 1123, fn. 10, 81 Cal.Rptr.2d 471, 969 P.2d 564; Monterey Plaza Hotel v. Hotel Employees & Restaurant Employees (1999) 69 Cal. App.4th 1057, 1064, 82 Cal.Rptr.2d 10.)" (ComputerXpress, Inc. v. Jackson (2001) 93 Cal.App.4th 993, 999, 113 Cal.Rptr.2d 625.)

II.

Section 425.16 Applies to This Case
The trial court's conclusion that respondent's allegedly libelous statements were protected by the anti-SLAPP statute explicitly rested on subdivisions (e)(3) and (e)(4) of section 425.16, which declare that "`an act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes ... (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in *423 furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." The order granting the motion to strike focused upon the public nature of the issue the parties disputed and to which Rosenthal's allegedly libelous statements related: "the validity or invalidity of alternative medicine." The court determined that this was "a highly controversial matter which is of significant public importance and interest, affecting the health of millions of people involving billions of dollars." Appellants do not challenge this determination. Implicitly conceding Rosenthal's statements relate to "an issue of public interest," they instead contend that the Internet sites on which Rosenthal posted her statements were not "a place open to the public or a public forum," as the trial court assumed, and Rosenthal therefore did not post the statements allegedly defaming appellants in furtherance of her right of free speech. This novel contention is difficult to take seriously.
Appellants' argument rests entirely on the recent opinion in Golden Gateway Center v. Golden Gateway Tenants Assn. (2001) 26 Cal.4th 1013, 111 Cal.Rptr.2d 336, 29 P.3d 797. The plurality opinion in that case, which has nothing to do with section 425.16, reads a state action requirement into the free speech clause of the California Constitution. The court held that the actions of a private property owner constitute state action under the free speech clause only if the property is freely and openly accessible to the public. Golden Gateway involved a privately owned apartment complex whose owner carefully limited access to the complex to residential tenants and their invitees. Since the owner's refusal to permit the tenants' association to distribute its newsletter in the private hallways of the complex did not constitute state action, the association did not have a right under California's free speech clause to distribute its newsletter in the complex.
So far as the record shows, Usenet, the owner of the interactive computer service on which Rosenthal posted her allegedly defamatory statements, never sought to enjoin her from doing so or to impose any restriction on her use of the site or that of the public.[5] Moreover, the Internet is not a separate physical place, like a hallway in an apartment building, but "a decentralized, global medium of communications or `cyberspace'that links people, institutions, corporations and governments around the world." (American Civil Liberties Union v. Reno (E.D.Pa.1996) 929 F.Supp. 824, 831, aff'd, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997).) The Internet "provides relatively unlimited, low-cost capacity for communication of all kinds.... This dynamic, multifaceted category of communication includes not only traditional print and news services, but also audio, video, and still images, as well as interactive, real-time dialogue. Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox. Through the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer." (Reno v. American Civil *424 Liberties Union, supra, 521 U.S. 844, 870, 117 S.Ct. 2329,138 L.Ed.2d 874.)
Considering that the Internet provides "the most participatory form of mass speech yet developed" (American Civil Liberties Union v. Reno, supra, 929 F.Supp. at p. 883), it is not surprising that courts have uniformly held or, deeming the proposition obvious, simply assumed that conventional Internet venues constitute a "public forum" or a place "open to the public" within the meaning of section 425.16. Thus, for example in ComputerXpress, Inc. v. Jackson, supra, 93 Cal. App.4th 993, 113 Cal.Rptr.2d 625, decided shortly after Golden Gateway, the court held that websites available free of charge to any member of the public "were public forums for purposes of section 425.16." (Id. at p. 1007, 113 Cal.Rptr.2d 625; see also Global Telemedia Intern., Inc. v. Doe (C.D.Cal.2001) 132 F.Supp.2d 1261, 1264; Nicosia v. De Rooy (N.D.Cal.1999) 72 F.Supp.2d 1093.) Golden Gateway provides no reason to ignore this self-evident truth.
The trial court correctly determined that Rosenthal made the necessary threshold showing that the act or acts of which appellants complain were taken "in furtherance of [her] right of petition or free speech under the United States or California Constitution in connection with a public issue" (§ 425.16, subd. (b)(1)), and were therefore within the ambit of the protection afforded by section 425.16. Thus we turn to the question whether appellants established a probability they will prevail on their defamation claims.

III.

The Trial Court Erroneously Concluded Appellant Polevoy Could Not Establish a Probability He Will Prevail on His Defamation Claim
With respect to all but one of the publications attributed to Rosenthal, the trial court finding that appellants failed to establish a probability they will prevail rested on the conclusion that the statements contained therein could not reasonably be interpreted as stating actual facts, and thus could not support any of appellants' claims for libel. Rosenthal's statements that appellants are "quacks," that appellant Barrett is "arrogant" and a "bully," and that Barrett tried to "extort" her "are not actionable," the court stated, "because they do not contain provably false assertions of fact, but rather are expressions of subjective judgment." Insofar as it relates to Barrett, appellants do not seriously refute this determination, which we find to have been correct. (Milkovich v. Lorain Journal Co. (1990) 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1.) Accordingly, we shall affirm the ruling granting the motion to strike the complaint as to appellant Barrett.
The single statement the court determined was a provably false statement of fact was that originated by codefendant Bolen "accusing Dr. Polevoy of stalking women and urging `health activists . . . from around the world' to file complaints to government officials, media organizations, and regulatory agencies." This statement specifically asserted that Polevoy stalked Christine McPhee, a "Canadian radio personality" whose program supported "alternative medicine," as part of a "criminal conspiracy" designed to intimidate McPhee. According to the republished statement, McPhee sought police protection and "the police kept two uniformed officers on site for some time, to deal with Polevoy." As noted, Bolen's message urged readers to bring this "criminal" conduct to the attention of government officials and asked them to initiate "criminal investigations."
The trial court found that although the assertion that Polevoy was guilty of criminal *425 conduct was a provably false statement of fact, Rosenthal's republication was not actionable for three independent reasons: first, because Rosenthal did not originate but merely republished the defamatory statement, she was immune from suit under section 230 of the Communications Decency Act (CDA) (47 U.S.C. § 230) (section 230); second, because appellants, who are public figures, failed to produce sufficient prima facie evidence of actual malice; and, third, because appellants could not establish that they suffered monetary damage of any kind.
We find that the immunity available under section 230 does not bar the imposition of liability in this case, that malice and reckless disregard for the truth can be inferred from the circumstances, which include the failure to conduct a reasonable investigation regarding the truth of the accusation of criminal conduct and reliance on obviously biased sources, and that Polevoy was not required to plead special damages, as the republished statement was libelous per se. (Civ.Code, § 45a.)

A.

The Federal Immunity Does Not Apply
Section 230 was incorporated by Congress into the final version of the CDA, which amended Title V of the Telecommunications Act of 1996 (P.L. No. 104-104, § 509 (Feb. 8, 1996) 110 Stat. 56). The central question in this case is the extent to which this statute abrogated the common law of defamation.
Under the common law, those who publicize another's libel may be treated in one of three ways: as primary publishers (such as book or newspaper publishers); as conduits (such as a telephone company); or as distributors (such as a book store, library, or news dealer). Because "they cooperate actively in the publication," primary publishers, also known as "original publishers," are generally held to a strict standard of liability comparable to that of authors. (Rest.2d of Torts, § 581, com. c; Prosser & Keeton, The Law of Torts (5th ed.1984) § 113 at p. 810.) Conduits, which lack the ability to screen and control defamatory speech that may occur over their systems, and are therefore least culpable, are ordinarily immune from liability. (See Anderson v. New York Telephone Co. (1974) 35 N.Y.2d 746, 361 N.Y.S.2d 913, 320 N.E.2d 647; see also Lunney v. Prodigy Services Co. (1999) 94 N.Y.2d 242, 249, 701 N.Y.S.2d 684, 723 N.E.2d 539 [in transmitting email, "an ISP [Internet service provider], like a telephone company, is merely a conduit"].) Distributors (sometimes known as "secondary publishers"), whose ability to control defamatory speech lies somewhere between that of primary publishers and conduits, are subject to an intermediate standard of responsibility and may only be held liable as publishers if they know or have reason to know of the defamatory nature of matter they disseminate. (Rest.2d Torts, § 581(1), corns, d and e; see also Smith v. California (1959) 361 U.S. 147, 152-153, 80 S.Ct. 215, 4 L.Ed.2d 205, on the constitutional dimension of the scienter requirement.) Absent such knowledge or reason to know, distributors are entitled to the same freedom from liability enjoyed by mere conduits of defamation.
Section 230 consists of two operative provisions, paragraphs (1) and (2) of subdivision (c), which is entitled "Protection for `Good Samaritan' blocking and screening of offensive material." (Subds.(a) and (b) consist, respectively, of findings and a statement of policy.)
Paragraph (1) states in material part that "[n]o provider or user of an interactive computer service shall be treated as *426 the publisher or speaker of any information provided by another information content provider." (§ 230, subd. (c)(1).) "Interactive computer service" is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational systems." (§ 230, subd. (f)(2).) An "information content provider," who is not an intermediary and is therefore not protected by section 230, is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." (§ 230, subd. (f)(3).)
Paragraph (2) of subdivision (c) states that "[n]o provider or user of an interactive computer service shall be held liable on account of(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1)." Elsewhere, section 230 provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." (§ 230, subd. (e)(3).)
The parties agree respondent Rosenthal acted as the "user of an interactive computer service" within the meaning of the statute, as did the trial court, and we are not called upon to address that question. Appellants acknowledge that a user is entitled to the same protection available under the statute to providers.
Appellants concede that section 230 bars treatment of providers or users of interactive computer services as primary publishers subject to strict liability, but maintain it does not bar treating them as distributors and subjecting them to knowledge-based liability. Appellants' argue that the trial court's interpretation of section 230 protects Internet intermediaries who intentionally distribute injurious third party content, and that this is contrary to the very purpose of the statute.[6] If the trial court's interpretation is upheld, appellants maintain, "a `clever libeler' could easily escape liability by having some other Internet user who is not subject to the jurisdiction of the Court, or who is anonymous, or who is judgment proof, publish libelous statements which another `Internet user' is free to republish." In appellants' view, such an interpretation would convert an act designed to promote "decency" into a shield for "indecency," which Congress could not have intended.
We agree with appellants that the statute cannot be deemed to abrogate the common law principle that one who republishes *427 defamatory matter originated by a third person is subject to liability if he or she knows or has reason to know of its defamatory character. (Rest.2d, Torts, § 581(1).) By construing section 230 as conferring an absolute immunity, the trial court erred.

1.
Like respondent, the trial court relied heavily on Zeran v. America Online, Inc. (4th Cir.1997) 129 F.3d 327, cert. den. (1998) 524 U.S. 937, 118 S.Ct. 2341, 141 L.Ed.2d 712 (Zeran), which is now the leading case interpreting and applying subdivision (c)(1) of section 230. In Zeran an unidentified person maliciously posted messages on an America Online (AOL) bulletin board advertising T-shirts featuring offensive slogans relating to the 1995 bombing of the Murrah Federal Building in Oklahoma City. Persons interested in purchasing the shirts were instructed to call "Ken" at Zeran's home phone number in Seattle. As a result, Zeran received a high volume of angry calls, including death threats. Zeran immediately contacted AOL and informed a company representative of his predicament. The next day an unknown person posted a similar message, again identifying Zeran as the purveyor of the tasteless shirts and providing his home phone number. Over the next four days similar messages were posted on the bulletin board relating to other items bearing still more offensive slogans. During this five-day period Zeran was receiving an abusive phone call every two minutes. After the messages were described on an Oklahoma City radio station by an announcer who urged listeners to phone Zeran, he was inundated with death threats. When Zeran filed suit against AOL it interposed section 230 as an affirmative defense and moved for summary relief. The trial court granted AOL's motion for judgment on the pleadings, holding that the statutory immunity shielded AOL from suits based on both publisher and distributor liability. (Zeran v. America Online, Inc. (E.D.Va.1997) 958 F.Supp. 1124.)
Affirming the ruling, the Fourth Circuit stated as follows: "Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium. The imposition of tort liability on service providers for the communications of others represented, for Congress, simply another form of intrusive government regulation of speech. Section 230 was enacted, in part, to maintain the robust nature of Internet communications and, accordingly, to keep government interference in the medium to a minimum. In specific statutory findings, Congress recognized the Internet and interactive computer services as offering `a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.' Id. § 230(a)(3). It also found that the Internet and interactive computer services `have flourished, to the benefit of all Americans, with a minimum of government regulation.'' Id. § 230(a)(4) (emphasis added). Congress further stated that it is `the policy of the United States ... to preserve the vibrant and competitive free market that currently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation.' Id. § 230(b)(2) (emphasis added). [¶] None of this means, of course, that the original culpable party who posts defamatory messages would escape accountability. While Congress acted to keep government regulation of the Internet to a minimum, it also found it to be the policy of the United States `to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.' Id. § 230(b)(5). Congress made a policy *428 choice, however, not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages." (Zeran, supra, 129 F.3d at pp. 330-531; see also Ben Ezra, Weinstein, & Co., Inc. v. America Online, Inc. (10th Cir.N.M.2000) 206 F.3d 980, 984-985; Blumenthal v. Drudge (D.D.C.1998) 992 F.Supp. 44, 49; Gentry v. eBay, Inc. (2002) 99 Cal.App.4th 816, 828-829, 121 Cal.Rptr.2d 703; Kathleen R. v. City of Livermore (2001) 87 Cal.App.4th 684, 692, 104 Cal.Rptr.2d 772.) As will be seen, we believe this characterization of section 230 is misleading insofar as it suggests that section 230 reflects a superseding congressional "desire to promote unfettered speech on the Internet." (129 F.3d at p. 334.)
The most consequential aspect of the Fourth Circuit's opinion in Zeran is its conclusion that section 230 immunized providers and users of interactive computer services from liability not only as primary publishers but also as distributors. Focusing solely on section 577 of the Restatement (Second) of Torts ["Publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed"], the court ignored the complementary common law rule described in section 581(1) of the Restatement, which is that "one who ... transmits defamatory matter published by a third person is subject to liability if, but only if, he knows or has reason to know of its defamatory character." (Italics added.) (See Zeran, supra, 129 F.3d at p. 332.)
The effect of Zeran is to confer on providers and users of interactive computer services complete immunity from liability for transmitting the defamation of a third party. The protection is available despite the fact that the provider or user knowingly distributes defamatory materials, even if the provider or user profits from such conduct. (See, e.g., Blumenthal v. Drudge, supra, 992 F.Supp. 44.) Since the decision in Zeran, no court has subjected a provider or user of an interactive computer service to notice liability for disseminating third-party defamatory statements over the Internet, though a three-judge minority of the Florida Supreme Court would have done so (Doe v. America Online, Inc. (Fla.2001) 783 So.2d 1010, 1018, dis. opn. of Lewis, J.), and at least one trial judge has gagged on the unfairness that resulted from application of such a broad immunity.[7]
*429 The view of most scholars who have addressed the issue is that Zeran's analysis of section 230 is flawed, in that the court ascribed to Congress an intent to create a far broader immunity than that body actually had in mind or is necessary to achieve its purposes.[8] We share that view. Cognizant that, "while federal circuit court precedence on issues of federal law is certainly entitled to substantial deference, it is not binding" (Yee v. Escondido (1990) 224 Cal.App.3d 1349, 1351, 274 Cal. Rptr. 551; accord, 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 942, at p. 983), we decline to accept Zeran's construction of the statute.[9]
Zeran states that section 230 has "dual purposes": First, "not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages" in order "to maintain the robust nature of Internet communications" (129 F.3d at pp. 330-331) and, second "to encourage service providers to self-regulate the dissemination of offensive material over their services." (Id. at p. 331.) According to the Zeran court, leaving distributor liability in effect "would defeat the two primary purposes of the statute and would certainly `lessen the *430 scope plainly intended' by Congress' use of the term `publisher.'" (Id. at p. 334, relying on Isbrandtsen Co. v. Johnson (1952) 343 U.S. 779, 783, 72 S.Ct. 1011, 96 L.Ed. 1294.) We believe the Zeran court conferred a much more expansive immunity than is necessary to achieve the first purpose and thereby completely defeated the second.
Zeran is posited on two critical determinations: first, that the word "publisher" in subdivision (c)(1) of section 230 refers not just to primary or original publishers of a third-party defamation but also to distributors and, second, that confining the immunity to primary publishers would not accomplish the policies section 230 was designed to effectuate. We believe neither determination is justified.

2.
The plaintiff in Zeran argued that section 230 should be construed so as to suspend only those aspects of the common law of defamation whose application would genuinely conflict with the purpose of the statutory immunity, the maintenance of robust Internet communications and the encouragement of self-regulation. The plaintiff conceded the common law liability of a primary publisher of a third party's defamatory statements was incompatible with those purposes, but maintained distributor liability was not, or at least that Congress never indicated it thought so. In making this argument, the plaintiff relied on the settled principle "that `statutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.' [Citations.] In such cases, Congress does not write upon a clean slate. [Citation.] In order to abrogate a common-law principle, the statute must `speak directly' to the question addressed by the common law. [Citations.]" (United States v. Texas (1993) 507 U.S. 529, 534, 113 S.Ct. 1631, 123 L.Ed.2d 245, italics added; accord, Theodor v. Superior Court (1972) 8 Cal.3d 77, 92, 104 Cal.Rptr. 226, 501 P.2d 234 ["it should not `be presumed that the Legislature in the enactment of statutes intends to overthrow long-established principles of law unless such intention is made clearly to appear either by express declaration or by necessary implication'"].)
The Zeran court concluded that in section 230 "Congress has indeed spoken directly to the issue by employing the legally significant term `publisher,' which has traditionally encompassed distributors and original publishers alike." (Zeran, supra, 129 F.3d at p. 334.) According to Zeran, the theory of distributor liability "is merely a subset, or a species, of publisher liability" (id. at p. 332) and therefore the use of the word "publisher" in subdivision (c)(1) ["No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider"] makes clear that the statute forecloses intermediate or notice liability, not just the stricter level of liability applicable to primary publishers. (Ibid.) On this reasoning the Zeran court maintained that foreclosure of distributor liability was not merely implicit in the structure and purpose of the statute, but was "explicitly stated" therein. (Id. at p. 334.) We cannot agree.
It is true that defamation requires a publication, and that every repetition is a publication, whether it is effectuated by a primary publisher or by a distributor; this is why distributors are sometimes referred to as "secondary publishers." However, as earlier explained, the common law subjects the two types of publishers to distinctly different standards of liability for the *431 transmission of the defamation of a third person. Because primary publishers ordinarily exercise control over content, they have a duty to monitor content; distributors, who have no such control, therefore have no such duty. It is entirely reasonable to assume Congress was aware of this significant and very well-established distinction, and that if it intended section 230 to immunize providers and users not merely from primary publisher liability but also from distributor liability it would have made this clear, as, for example, by adding the word "distributor," and not merely barring liability "as the publisher or speaker" of information provided by another. Section 230 does not explicitly absolve providers or users from all liability. The statement that they "shall not incur liability as publishers or speakers of information provided by other content providers" (§ 230, subd. (c)(1), italics added) does not expressly or even by necessary implication foreclose the possibility of holding them liable as distributors. "Indeed, one could argue from the enumeration of publisher and speaker in § 230(c)(1) that distributor was deliberately omitted." (Sheridan, Zeran v. AOL and the Effect of Section 230, supra, 61 Alb.L.Rev. 147, 162.)[10]
The constitutional implications of granting publishers an absolute immunity or privilege as a disincentive to excessive self-censorship has for decades been the subject of an intense debate, barely alluded to in Zeran. As the United States Supreme Court has stated, "[t]he need to avoid self-censorship by the news media is ... not the only societal value at issue. If it were, this Court would have embraced long ago the view that publishers and broadcasters enjoy an unconditional and indefeasible immunity from liability for defamation. [Citations.] Such a rule would, indeed, obviate the fear that the prospect of civil liability for injurious falsehood might dissuade a timorous press from the effective exercise of First Amendment freedoms. Yet absolute protection for the communications media requires a total sacrifice of the competing value served by the law of defamation. [¶] The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood. We would not lightly require the State to abandon this purpose, for, as Mr. Justice Stewart has reminded us, the individual's right to the protection of his own good name `reflects no more than our basic concept of the essential dignity and worth of every human beinga concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system.' (Rosenblatt v. Baer (1966) 383 U.S. 75, 92 [86 S.Ct. 669, 15 L.Ed.2d 597] (conc.opn.).'" (Gertz v. Robert Welch, Inc. (1974) 418 U.S. 323, 341, 94 S.Ct. 2997, 41 L.Ed.2d 789.) Zeran's analysis flies in the face of this admonition.
*432 Legislative use of the legally uncertain word "publisher" is simply too flimsy a basis upon which to grant providers and users of interactive computer services what amounts to an "absolute protection" requiring the "total sacrifice of the competing value served by the law of defamation" and the subordination of "a concept at the root of any decent system of ordered liberty." (Gertz v. Robert Welch, Inc., supra, 418 U.S. at p. 341, 94 S.Ct. 2997.) When distinguishing the liability of publishers and distributors, eminent law professors writing scholarly articles in learned journals commonly use the word "publisher" to refer only to a primary publisher, even when their subject is the transmission of speech in cyberspace. (See, e.g., Sunstein, The First Amendment in Cyberspace (1995) 104 Yale L.J. 1757, 1801; and other articles cited in Sheridan, Zeran v. AOL and the Effect of Section 230, supra, 61 Alb.L.Rev. 147, 168, fn. 143.) So too do courts commonly use the word "publisher" to refer only to an original or primary publisher. For example, in Stratton Oakmont, Inc. v. Prodigy Services Co. (N.Y.Sup.Ct. May 25, 1995) 1995 WL 323710, 23 Media L. Rep. 1794a well known pre-CDA libel case that, as we later discuss (post, at pp. 433-35), was of particular interest to Congress during debate on the measure that became section 230the court observed that "[a] finding that Prodigy is a publisher is the first hurdle for Plaintiffs to overcome in pursuit of their defamation claims, because one who repeats or otherwise republishes a libel is subject to liability as if he had originally published it." (Id. at p. 1796, italics added.) It is impossible to say with confidence that Congress did not also use the word "publisher" in this conventional manner. In any case, in law and as it appears in section 230, the word "publisher" is at least capable of two reasonable constructions and therefore ambiguous, which is enough to justify application of the interpretive canon favoring retention of common law principles. "Where there is a limitation by statute which is capable of more than one construction the statute must be given that construction which is consistent with common law." (Singer, Statutes and Statutory Construction (6th ed.2000) § 50.01 pp. 137-139, fn. omitted.)
Resting on the use of the ambiguous word "publisher" in subdivision (c)(1) of section 230, the Zeran court felt it unnecessary to examine anything else in the text of the statute to determine whether it "speaks directly" to the question addressed by the common law principle of distributor liability. But the rest of the text deserves examination, for it sheds light on the breadth of the immunity Congress intended to create.
The findings and declarations set forth in section 230 applaud the "true diversity of political discourse," the "opportunities for cultural development," and the "myriad avenues for intellectual activity" provided by "the vibrant and competitive free market that presently exists for the Internet and other interactive computer services" (§ 230, subds.(a), (b)), but nowhere in the findings and declarations is there any indication that Congress considered online speech in need of protection. Nor is a general concern for the promotion of speech evident in subdivision (c)(2), entitled "Protection for `Good Samaritan' blocking and screening of offensive material," which we think particularly revealing. This provision immunizes providers and users against liability on account of action "to restrict access to or availability of material that the provider or user considers to be ... objectionable, whether or not such material is constitutionally protected," or to provide others "the technical means to restrict access to [such] material ...." (§ 230, subd. (c)(2)(A) & (B), italics added.)
*433 If, as Zeran says, Congress's use of the word "publisher" covers distributors as well as original publishers, and therefore reflects an intent to create an absolute immunity, it would not have been necessary for Congress to specifically protect providers and users who monitor content; subdivision (c)(2) would be mere surplusage.
The only thing unambiguously communicated by the entire text of section 230 is a prohibition on the imposition of primary publisher liability on providers and users who act to restrict access to offensive or injurious materials.[11] Because the statute does not clearly indicate an intention to abrogate the common law principle of distributor liability it is appropriate to inquire whether the legislative history demonstrates such an intention. (People v. Broussard (1993) 5 Cal.4th 1067, 1075, 22 Cal.Rptr.2d 278, 856 P.2d 1134; American Tobacco Co. v. Superior Court (1989) 208 Cal.App.3d 480, 487-488, 255 Cal.Rptr. 280; Lewis v. Ryan (1976) 64 Cal.App.3d 330, 333,134 Cal.Rptr. 355.)

3.
The measure that eventually became section 230 was originally presented by Congressmen Cox and Wyden as a direct amendment to the Telecommunications Act of 1996 (P.L. No. 104 104, § 509 (Feb. 8, 1996) 110 Stats. 56; see 141 Cong. Rec. H8468 (daily ed. Aug. 4, 1995)). The CDA was also offered as an amendment to the Telecommunications Act, by Senators Exon and Coats. After the Cox-Wyden measure and the CDA both passed, the former was incorporated into the latter. The incorporation made sense. The overarching purpose of the CDA was to protect minors from harmful material on the Internet. One of the main ways in which Congress sought to achieve this goal was to criminalize "the `knowing' transmission of `obscene or indecent' messages to any recipient under 18 years of age." (Reno v. American, Civil Liberties Union, supra, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874. [12] The Cox-Wyden measure, now section 230, was germane because it immunizes providers or users who take action to restrict access to such material. Immunizing providers or users from primary publisher liability advances this shared purpose because such liability would punish providers or users who tried to identify and remove offensive material but failed. But immunizing them as well from distributor *434 liability would be inconsistent with that purpose, because it would protect providers or users who not only made no independent effort to identify and remove offensive material, but who failed or refused to remove it even when placed on notice of the injurious character of the third-party content they were distributing.
As Zeran acknowledges (129 F.3d at p. 331), the committee report pertaining to section 230 indicates only that the statute was designed to overrule Stratton Oakmont, Inc. v. Prodigy Services Co., supra, 1995 WL 323710, 23 Media L.Rep. 1794 (Stratton Oakmont). (H.R. Conf. Rep. No 104-458 at 194 (1996).) "There, the plaintiffs sued Prodigyan interactive computer service like AOLfor defamatory comments made by an unidentified party on one of Prodigy's bulletin boards. The court held Prodigy to the strict liability standard normally applied to original publishers of defamatory statements, rejecting Prodigy's claims that it should be held only to the lower `knowledge' standard usually reserved for distributors. The court reasoned that Prodigy acted more like an original publisher than a distributor both because it advertised its practice of controlling content on its service and because it actively screened and edited messages posted on its bulletin boards." (Zeran, supra, 129 F.3d 327, 331.)
Congress overruled Stratton Oakmont because it wanted "to remove the disincentives to selfregulation" created by the decision. (Zeran, supra, 129 F.3d. at p. 331.) Under Stratton Oakmont, "computer service providers who regulated the dissemination of offensive material on their services risked subjecting themselves to liability, because such regulation cast the service provider in the role of a publisher. Fearing that the specter of liability would therefore deter service providers from blocking and screening offensive material, Congress enacted § 230's broad immunity `to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material.' 47 U.S.C. § 230(b)(4). In line with this purpose, § 230 forbids the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions." (Ibid.)
It is noteworthy that in holding Prodigy to be a primary publisher the Stratton Oakmont court distinguished Cubby, Inc. v. CompuServe, Inc. (S.D.N.Y.1991) 776 F.Supp. 135, which was then the leading authority on the liability of Internet service providers for third-party defamation. In Cubby the defendant service provider was held to the standard of liability applicable to a distributor, not a primary publisher.[13] The authors of section 230 knew *435 this and did not object, as they did to the different and higher standard of liability imposed in Stratton Oakmont. "Representative Cox, one of two sponsors of the immunity provision, characterized the imposition of distributor liability in Cubby as holding that CompuServe `was not the publisher or editor' of the material. He clearly used the term `publisher' to exclude parties held to the distributor liability standard applied to CompuServe in that case. 141 Cong. Rec. H8469 (daily ed. Aug. 4, 1995) (statement of Rep. Cox). The provision's sponsors summarized both the Cubby and Stratton decisions, and then repeatedly discussed the need to overrule Stratton, without again mentioning Cubby. ..." (Freiwald, Intermediary Liability for Defamation, supra, 14 Harv. J.L. & Tech. at p. 632, fn. 259 (italics in original); see also Cannon, The Legislative History of Senator Exon's Communications Decency Act: Regulating Barbarians on the Information Superhighway (1996-1997) 49 Fed. Comm.L.J. 51, at pp. 61-63.)
The expressed desire to overrule Stratton Oakmont, the absence of any apparent intent to disturb the effect of the decision in Cubby, and the statements of Representative Cox, the author of section 230, are consistent with exclusion of distributor liability from the statutory immunity.
Survival of distributor liability is also consistent with the views expressed by Senator Coats, one of the two chief authors of the CDA. During the legislative debate, Senator Coats made it clear that the intention was to prevent Internet intermediaries which try to keep offensive material off the Internet "from being held liable as a publisher for defamatory materials for which they would not otherwise have been liable." (141 Cong. Rec. S8345 (daily ed. Jun. 14, 1995).) According to Senator Coats, "we don't intend that a court could hold that this is assertion of editorial content control, such that a company must be treated under the high standard of a publisher for the purposes of offenses such as libel." (Ibid., italics added.) This statement indicates that, because they do not exercise "editorial content control," distributors are not subjected by the statute to the "high standard" of liability applicable to publishers, but rather remain subject to the intermediate standard applicable to distributors under the common law.
In short, as one commentator sums up, "both the text of the CDA and its meager legislative history support the conclusion that when Congress said `publisher,' it meant `publisher,' and not distributor. The publisher and distributor terminology have been used in cases and commentary on the subject of defamation in interactive networks. It would be reasonable to surmise that Congress would say `distributor' in addition to `publisher' if it meant `distributor' in addition to `publisher.' The statement in the Conference Report that § 230 is intended to overrule Stratton Oakmont supports this conclusion.... Since Stratton Oakmont did not impose distributor liability, it was not necessary for Congress to obviate distributor liability in order to overrule the case." (Sheridan, Zeran v. AOL and the Effect of Section 230, supra, 61 Alb.L.Rev. 147, 168-169.)
"The stated policy objectives in the plain language and the legislative history of the CDA actually compel the conclusion that Congress intended for ISPs to remain subject to distributor liability in certain contexts. Section 230(b) states that `[i]t is the policy of the United States' to: (1) `encourage *436 the development of technologies that maximize user control over what information is received' over the Internet, and (2) `remove disincentives [for ISPs to] develop[] and utiliz[e] ... blocking and filtering technologies' in order to facilitate the screening of `objectionable' material displayed over the Internet. In other words, in enacting the CDA, Congress intended to create incentives for ISPs to screen and edit the content of information displayed over the Internet. If ISPs were immune from both publisher and distributor liability in third-party defamation claims, they would essentially be given blanket immunity from liability. This interpretation of the `Good Samaritan' immunity, which is advocated in Zeran, would frustrate, rather than follow, the purpose of the CDA. Congress intended to encourage ISPs to monitor the content on the Internet, but if ISPs are granted absolute immunity for disseminating third-party defamatory material, then ISPs will not bother to screen their content at all because they will never be subject to liability. If, on the other hand, ISPs could be held liable as a distributor for neglecting to monitor information or failing to remove objectionable content that is brought to their knowledge, then ISPs would have a greater incentive to screen content. Common sense dictates that an ISP will not waste its time and money monitoring content over the Internet when it will suffer no repercussions from failing to do so. Thus, immunizing ISPs from distributor liability would frustrate Congress's objectives under the CDA much more than would subjecting ISPs to distributor liability." (Patel, Immunizing Internet Service Providers From Third-Party Internet Defamation Claims: How Far Should Courts Go?, supra, 55 Vand. L.Rev. at p. 684, fns. omitted; see also, Erlich, Communications Decency Act § 230 (2002) 17 Berk. Tech.L.J. 401, 411 ["Congress tried to take the middle road between full liability, a disincentive to filter, and zero liability, a lack of incentive to filter. Courts, on the other hand, have dismissed this balance and clearly favor the latter"].) Ironically, Zeran has had precisely the same effect as Stratton Oakmont, the decision section 230 was designed to overrule: "[n]either decision creates any incentive for ISPs to prevent the dissemination of defamatory content." (McManus, Rethinking Defamation Liability for Internet Service Providers, supra, 35 Suffolk U.L.Rev. at p. 668.)

4.
Although Zeran's conclusion that Congress "explicitly" commanded the abrogation of distributor liability (129 F.3d at p. 334) rendered it unnecessary to inquire whether the command was implied by the statute, the court went on to find that immunity from distributor liability was also mandated by "the practical implications of notice liability in the interactive computer service context." (Id. at p. 333) Maintaining that "it would be impossible for service providers to screen each of their millions of postings for possible problems" (id. at p. 331), the Zeran court concluded that "[l]ike the strict liability imposed by the Stratton Oakmont court, liability upon notice [would] reinforce[ ] service providers' incentives to restrict speech and abstain from self-regulation" (id. at p. 333), which the court felt inconsistent with one of the chief purposes of section 230.
In essence, Zeran concludes that section 230 was designed "to promote unfettered speech on the Internet" (129 F.3d at p. 334) and notice liability would negate that purpose because, "like strict liability, liability upon notice has a chilling effect on speech." (Id. at p. 333.) We question whether a statute that encourages the restriction of certain types of online material *437 "whether or not such material is constitutionally protected" (§ 230, subd. (c)(2)(A)) can fairly be said to reflect a desire "to promote unfettered speech." But that issue aside we also think it debatable whether notice liability would actually have an unduly chilling effect on cyberspeech. Neither the record before us nor any other information brought to our attention provides an answer to that question. Moreover, the speculative conclusion of the Zeran court that exposing Internet intermediaries to knowledge-based liability would significantly chill online speech is disputed by the speculations of other authorities.[14] We set forth the views of some of the commentators who disagree with Zeran on this point solely to illustrate the nature of the ongoing debate.
To begin with, Zeran's critics emphasize that market forces exert enormous influence on the character of information transmitted over the Internet, and the excessive removal of Internet postings, or a type of postings, without any inquiry as to whether they are actually defamatory would not likely be tolerated by the market. "[N]ews travels fast over interactive computer services, and a service that removes members' postings without any investigation is likely to get a bad reputation in a community whose first value is the free flow of information." (Sheridan, Zeran v. AOL and the Effect of Section 230, supra, 61 Alb. L.Rev. 147, 176; accord, Freiwald, Intermediary Liability for Defamation, supra, 14 Harv. J.L. & Tech. 569, 622; Butler, Plotting the Return of an Ancient Tort to Cyberspace: Towards a New Federal Standard of Responsibility for Defamation for Internet Service Providers (1999-2000) 6 Mich. Telecomm. & Tech. L.Rev. 247, 264.)
It is also asserted that by ignoring how difficult it is for a plaintiff to prevail on a defamation claim or receive significant money damages, the Zeran court overstated the danger such claims present to Internet intermediaries, and therefore also exaggerated the danger they would engage in excessive self-censorship. In fact, the critics maintain, "[i]t is not at all clear that being exposed to distributor liability would be a disaster for online services." (Sheridan, Zeran v. AOL and the Effect of Section 230, supra, 61 Alb. L.Rev. 147, 173.) First of all, it must be shown that an alleged defamation is not an opinion or satire or mere hyperbole but an assertion of actual fact, and even then knowledge and the requisite degree of fault must be shown. Furthermore, if the defamation relates to a public figure or matter of public concern, as will often be the case, the intermediary would also have to be *438 shown to have acted with actual malice, which is usually extremely difficult. (Id. at p. 174.) Even if the defamation relates to a private figure it ordinarily would not be actionable without proof of special damage (Civ.Code, § 45a), and the defendant might have the advantage of one or more of the many common law privileges for types of speech deemed worthy of extra protection. For these and other reasons, as empirical studies confirm, it is very hardindeed, "almost impossible"for plaintiffs to succeed in defamation actions. (Lidsky, Silencing John Doe: Defamation & Discourse in Cyberspace, supra, 49 Duke L.J. 855, 875, citing Bezanson et al, Libel Law and the Press (1987).) Finally, in California and other jurisdictions that have an anti-SLAPP statute such as ours, defendants in unmeritorious defamation actions need not even answer the complaint and can obtain quick dismissal and their attorney fees.
Zeran is also criticized for suggesting that distributor liability would require service providers to screen "each of their millions of postings for possible problems." (129 F.3d at p. 331.) Distributor liability would not require a service provider to review communications in advance of posting them (see, e.g., Auvil v. CBS "60 Minutes" (E.D.Wash.1992) 800 F.Supp. 928, 931-932) but only to act reasonably after being placed on notice that the communication is defamatory.[15] It is said that Internet intermediaries would not likely learn of the defamatory character of the message at issue until some time after it was posted. "Since the service would be liable only for damages caused by its tortious conduct, and since most of the damages would occur before the service committed a tort, even a service that was found liable would not face a large damage award." (Sheridan, Zeran v. AOL and the Effect of Section 230, supra, at p. 173.)
Zeran's indifference to the many different ways in which defamation may be transmitted over the Internet, and the different levels of control over injurious communications an intermediary may possess, is also criticized. (See, e.g., McManus, Rethinking Defamation Liability for Internet Service Providers, supra, 35 Suffolk U. L.Rev 647, 661) In some contextssuch as e-mailservice providers are not only unaware of the nature of the information they distribute but, as a practical matter, cannot control transmissions. But in other contextsnewsgroups and bulletin boards, for exampleproviders and users can and do control the messages they distribute.[16] *439 (Lunney v. Prodigy Services Co., supra, 94 N.Y.2d 242, 249-250, 701 N.Y.S.2d 684, 723 N.E.2d 539.) It is one thing to grant an Internet intermediary immunity on the basis of a factual analysis of the degree of control, if any, it exerts over content (see, e.g., Religious Technology Center v. Netcom On-Line Communication Services, Inc., supra, 907 F.Supp. 1361, 1372 ["No purpose would be served by holding liable those who have no ability to control the information to which their subscribers have access"]), but quite another to grant immunity without regard to that critical factor.
The overarching theme of Zeran's critics is that the court's analysis is unbalanced. "Grounding arguments for complete intermediary immunity in First Amendment concerns does not make them any more persuasive. Rather, advocates of a rule that would accord little or no weight to defamation victims' interest should bear a heavy burden of persuasion. Claims that cyberspace technologies create unique opportunities for free social discourse must be balanced against the reality that those technologies can also encourage defamation, exacerbate its harm, and insulate its original author from suit." (Freiwald, Intermediary Liability for Defamation, supra, 14 Harv. J.L. & Tech. 569, 618, fn. omitted) "In sum, a distributor liability rule that encouraged some response by intermediaries would be socially efficient: the benefits from reduced defamation injury would likely greatly exceed the cost of response by intermediaries. Such liability seems particularly critical in online defamation cases, given those factors of cyberspace communication that both encourage production of serious defamation and limit a victim's ability to bring original authors to account. Not surprisingly, many commentators have agreed that an intermediate form of liability for intermediaries would make the most sense. In fact, almost all of those who commented on Cubby viewed its imposition of distributor liability as the correct legal rule choice." (Id. at p. 620, fns. omitted; see also Butler, Plotting the Return of an Ancient Tort to Cyberspace, supra, 6 Mich. Telecomm. & Tech. L.Rev. 247, 272 [explaining why exposure to distributor liability "would do the least harm to the forum for free speech over the Internet"]; Bovenzi, Liability of Systems Operators on the Internet, supra, 11 Berk. Tech.L.J. 93, 139 [knowledge-based liability "would preserve freedom of expression on computer networks"].)
We re-emphasize that we take no position on whether distributor liability would unduly chill online speech. Like our Supreme Court, which has also felt it appropriate to acknowledge the views of informed "academic writers" as to the application of law to evolving Internet technologies, we discuss the debate whether exposing Internet intermediaries to distributor liability would chill online speech "only to note its existence and *440 contours, not to attempt its resolution." (Intel Corp. v. Hamidi (2003) 30 Cal.4th 1342, 1363, 71 P.3d 296.) Resolution of the controversy requires information this court (which, like the Zeran court, is asked to review a pretrial ruling) does not now possess: whether a provider or user of an interactive computer service could, at relatively low expense, determine whether challenged material is defamatory and remove it, or whether, on the contrary, the imposition of notice liability would place a burden on providers and users they could not sustain without automatically removing all material claimed to be defamatory, thereby eliminating some and perhaps much information that is constitutionally protected. The answer to this question depends on the state of Internet technology, a matter never addressed by the parties in this case or by the trial court. "Given the extraordinarily rapid growth of this technology and its developments, it is plainly unwise to lurch prematurely into emerging issues, given a record that does not at all lend itself to their determination." (Lunney v. Prodigy Services Co., supra, 94 N.Y.2d 242, 252, 701 N.Y.S.2d 684, 723 N.E.2d 539; accord, Lessig, The Path of Cyberlaw (1995) 104 Yale L.J. 1743, 1752 [urging courts to "follow the meandering development of the common law" before "venturing too boldly" into the regulation of cyberspace]; Hadley, The Gertz Doctrine and Internet Defamation (1998) 84 Va. L.Rev. 477, 507 ["while the Internet is in its infancy, fundamentally altering the balance in favor of shielding defamatory statements against private persons is both premature and dangerous"].)
American courts, and above all the Supreme Court, have struggled to define the proper accommodation between the common law of defamation and the constitutional freedom of speech. Under the present regime, the burdens that must be borne by a plaintiff claiming defamation depend upon whether he or she is a public official or public figure and whether the speech at issue relates to a matter of private or public concern. Where the libel is claimed by a private figure, and the speech does not relate to a matter of public concern, the burdens the plaintiff must bear are largely those of the common law. At the other extreme, where defamation is claimed by a public official and relates to a matter of public concern, the constitution places on the plaintiff the burden of showing both falsity and fault, which are forbidding requirements. (See Philadelphia Newspapers, Inc. v. Hepps (1986) 475 U.S. 767, 775, 106 S.Ct. 1558, 89 L.Ed.2d 783.) In short, as to defamation, our jurisprudence establishes a nuanced legal regime: while "libel can claim no talismanic immunity from constitutional limitations" (New York Times Co. v. Sullivan (1964) 376 U.S. 254, 269, 84 S.Ct. 710, 11 L.Ed.2d 686), neither does the constitutional freedom provide an unfettered right to libel. Proposals to create such an unfettered right, as by the creation of a categorical immunity or privilege, have been controversial and strongly contested.[17] Thus, resisting *441 an effort to create a "special immunity" different from the one at issue here, the California Supreme Court recently expressed its unwillingness to hold "that messages transmitted through the Internet are exempt from the ordinary rules of tort liability." (Intel Corp. v. Hamidi, supra, 30 Cal.4th 1342, 1347, 71 P.3d 296.)
"`[R]epeals by implication are not favored, and ... a statute will not be construed as taking away a common law right existing at the date of its enactment, unless that result is imperatively required; that is to say, unless it be found that the pre-existing right is so repugnant to the statute that the survival of such right would in effect deprive the subsequent statute of its efficacy; in other words, render its provisions nugatory.'" (Sierra Pac. Power Co. v. Federal Power Commission (D.C.Cir.1955) 223 F.2d 605, 607, quoting Texas & P. Ry. Co. v. Abilene Cotton Oil Co. (1907) 204 U.S. 426, 437, 27 S.Ct. 350, 51 L.Ed. 553 (italics added), opn. amended, 237 F.2d 756, cert. granted, 349 U.S. 937, 75 S.Ct. 785, 99 L.Ed. 1265 (1955), and ordered aff'd., 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388.) Survival of knowledge-based liability under the common law would not render section 230 nugatory. Moreover, without suggesting that the statute was designed to promote unfettered online speech or that we need to decide the question, we do not think it can now be confidently determined whether intermediary liability would have a more chilling effect on online speech than it does on other forms of speech.
In these circumstances courts should not "take it upon themselves to set out novel rules for the protection of speech that deviate sharply and consciously from common law rules...." (Epstein, Privacy, Publication, and the First Amendment: The Dangers of First Amendment Exceptionalism (2000) 52 Stan. L.Rev. 1003, 1047.)

5.
Because section 230 does not "`speak directly' to the question addressed by the common law" (United States v. Texas, supra, 507 U.S. 529, 534, 113 S.Ct. 1631, 123 L.Ed.2d 245), and is capable of more than one construction, we conclude that the statute should not be interpreted as having abrogated the common law principle of distributor or knowledge-based liability.
Rosenthal has not alleged any fact that would prevent her from being subjected to distributor liability under the common law. Polevoy alleges he notified her that Bolen's statement contained false and defamatory information and asked that the statement be removed from the newsgroups *442 on which Rosenthal posted it, that she refused these requests and thereafter repeatedly reposted the allegedly defamatory statements on Internet newsgroups. Rosenthal's answer denies the statements were false but admits all of the other allegations. However, her special motion to strike under the anti-SLAPP statute was not based on the truth of the statements that Polevoy engaged in criminal conduct nor did it deny she knew or had reason to know of the defamatory character of these statements. The motion was based solely on the grounds of the federal immunity, appellants inability to show actual malice, and their failure to plead special damages. Furthermore, Rosenthal has never asserted that, due to the technology or for any other reason, she could not easily withdraw and/or correct the allegedly defamatory materials she posted.
Because section 230 does not restrict distributor liability under the common law and at this preliminary stage of the litigation no reason appears why Rosenthal cannot be subjected to such liability, the trial court erred in finding that appellant Polevoy's defamation claim was barred by the statute.

B.-C.[**]

IV.-VI.[**]

DISPOSITION
The order granting the special motion to strike pursuant to section 425.16 is reversed insofar as it applies to appellant Polevoy, in all other respects the order is affirmed. The matter is remanded to the trial court for further proceedings consistent with this opinion.
We concur: LAMBDEN and RUVOLO, JJ.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III.B, III.C, IV, V, and VI.
[1] "The Usenet has been described as a worldwide community of electronic BBSs [bulletin board servers] that is closely associated with the Internet and with the Internet community. [¶] The messages in Usenet are organized into thousands of topical groups, or `Newsgroups' .... [¶] As a Usenet user, you read and contribute (`post') to your local Usenet site. Each Usenet site distributes its users' postings to other Usenet sites based on various implicit and explicit configuration settings, and in turn receives postings from other sites. Usenet traffic typically consists of as much as 30 to 50 Mbytes of messages per day. [¶] Usenet is read and contributed to on a daily basis by a total population of millions of people.... [¶] There is no specific network that is the Usenet. Usenet traffic flows over a wide range of networks, including the Internet and dial-up phone links." (Religious Technology Center v. Netcom On-Line Communications Services, Inc. (N.D.Cal.1995) 907 F.Supp. 1361, 1366, fn. 4, quoting Dern, The Internet Guide for New Users (1994) at pp. 196-197; see also discussion, post, at p. 438, fn. 16.)
[2] "Newsgroups," like automatic mailing list service ("mail exploders" or "listservs"), chat rooms, and websites, are among the various communication and information retrieval methods that can be used by anyone with access to the Internet. (Reno v. American Civil Liberties Union (1997) 521 U.S. 844, 851, 117 S.Ct. 2329, 138 L.Ed.2d 874.) "Newsgroups also serve groups of regular participants, but these postings may be read by others as well. There are thousands of such groups, each serving to foster an exchange of information or opinion on a particular topic running the gamut from, say, the music of Wagner to Balkan politics to AIDS prevention to the Chicago Bulls. About 100,000 new messages are posted every day. In most newsgroups, postings are automatically purged at regular intervals." (Ibid.) The communication that takes place via newsgroups is similar to that which takes place in "chat rooms," in which two or more individuals engage in real-time dialogue, and on the World Wide Web.
[3] The other defendants, who are not parties to this appeal, are Hulda Clark, described in the complaint as "an unlicensed naturopath who resides in California and operates a clinic in California and Mexico .... [who] claims that all cancers and many other diseases are caused by `parasites, toxins, and pollutants' and can be cured within a few days by administering a low-voltage electric current, herbs and other nonstandard modalities"; the Dr. Clark Research Association, a corporation which allegedly "[p]rovides news and other information about Hulda Clark and her activities, ... [d]escribes and promotes Dr. Clark's theories and methods," and promotes and sells her products and instructional materials; David P. Amrein, the founder and president of the Dr. Clark Research Association; and Tim and Jan Bolen, who allegedly "do business as JURIMED, an entity whose purpose is to assist `alternative' health practitioners faced with regulatory action, criminal prosecution, or other matters that threaten their financial well-being and/or license to practice."
[4] The record does not show, and Rosenthal has never claimed, that Bolen created or developed this information and furnished it to her under circumstances in which a reasonable person in her position would conclude that it was provided for publication on the Internet or other "interactive computer service." (See Batzel v. Smith (9th Cir.2003) 333 F.3d 1018, 1033-1034.)
[5] Nor would it matter much if Rosenthal had violated a valid use restriction. One who drives a car bearing a political message on a bumper sticker is not constitutionally unprotected merely because the private agency from which the vehicle was rented barred the use of bumper stickers. The rental agency might have a remedy for breach of the rental agreement, but those who viewed the message while traveling on the public streets and found it objectionable could not complain on that basis.
[6] Relying on the federal district court opinion in Batzel v. Smith (C.D.Cal., Jun. 5, 2001, NO. CV 00-9590 SVW(AJWX)), 2001 WL 1893843, appellants also argue that a provider or user who, like Rosenthal, intentionally republishes libelous third party content is in part responsible for the creation and development of that information, and is therefore an "information content provider." (§ 230(f)(3).) Since section 230 only restricts the liability of intermediaries, appellants maintain that Rosenthal's conduct is unprotected. Though we are aware the Ninth Circuit has rejected this theory (Batzel v. Smith, supra, 333 F.3d 1018 at pp. 1031-1032), we decline to address the issue. Not only did appellants raise it for the first time in a reply brief, but resolution of the issue is unnecessary to the disposition of this appeal. (Palermo v. Stockton Theatres, Inc. (1948) 32 Cal.2d 53 at p. 65, 195 P.2d 1.)
[7] In Blumenthal v. Drudge, supra, 992 F.Supp. 44, the "Drudge Report," an Internet gossip column maintained by AOL, falsely reported that Sidney Blumenthal, then a White House aide, had a history of spousal abuse. Blumenthal sued AOL, which moved for summary judgment on the ground of section 230 immunity. Federal District Judge Paul L. Friedman granted the motion though not without questioning the result he felt compelled to reach: "If it were writing on a clean slate, this Court would agree with plaintiffs. AOL has certain editorial rights with respect to the content provided by Drudge and disseminated by AOL, including the right to require changes in content and to remove it; and it has affirmatively promoted Drudge as a new source of unverified instant gossip on AOL. Yet it takes no responsibility for any damage he may cause. AOL is not a passive conduit like the telephone company, a common carrier with no control and therefore no responsibility for what is said over the telephone wires. Because it has the right to exercise editorial control over those with whom it contracts and whose words it disseminates, it would seem only fair to hold AOL to the liability standards applied to a publisher or, at least, like a book store owner or library, to the liability standards applied to a distributor. But Congress has made a different policy choice by providing immunity even where the interactive service provider has an active, even aggressive role in making available content provided by others. In some sort of tacit quid pro quo arrangement with the service provider community, Congress has conferred immunity from tort liability as an incentive to Internet service providers to self-police the Internet for obscenity and other offensive material, even where the self-policing is unsuccessful or not even attempted." (Id. at pp. 51-52.)
[8] See, e.g., Patel, Immunizing Internet Service Providers From Third-Party Internet Defamation Claims: How Far Should Courts Go? (2002) 55 Vand. L.Rev. 647, 679-689; Freiwald, Comparative Institutional Analysis in Cyberspace: The Case of Intermediary Liability for Defamation (2001) 14 Harv. J.L. & Tech. 569, 594-596 (hereafter Intermediary Liability for Defamation); McManus, Rethinking Defamation Liability for Internet Service Providers (2001) 35 Suffolk U. L.Rev. 647; Goldstein, Service Provider Liability for Acts Committed by Users: What You Don't Know Can Hurt You (2000) 18 J. Marshall J. Computer & Info.L. 591, 634-635; Spencer, Defamatory Email and Employer Liability: Why Razing Zeran v. America Online is a Good Thing (2000) 6 Rich. J.L. & Tech. 25; Davidson et al, The Law of Cyberspace Liability of Information Service Providers (2000) 574 Prac.L.Inst. 143; Cordero, Damnum Absque Injuria: Zeran v. AOL and Cyberspace Defamation Law (1999) 9 Fordham Intell.Prop.Media & Ent. L.J. 775, 778; Pantazis, Zeran v. America Online, Inc.: Insulating Internet Service Providers From Defamation Liability (1999) 34 Wake Forest L.Rev. 531, 547-550 (1999); Kane, Internet Service Providers' Liability: Blumenthal v. Drudge (1999) 14 Berk. Tech.L.J. 437,452-453; Wiener, Negligent Publication of Statements Posted on Electronic Bulletin Boards: Is There Any Liability Left After Zeran? (1999) 39 Santa Clara L.Rev. 905; Ballon, Zeran v. AOL: Why the Fourth Circuit is Wrong (1998) J.Internet L.; Sheridan, Zeran v. AOL and the Effect of Section 230 of the Communications Decency Act Upon Liability for Defamation on the Internet (1997) 61 Alb. L.Rev. 147, 169-170 (hereafter Zeran v. AOL and the Effect of Section 230); Langdon, The Communications Decency Act § 230: Makes Sense? Or Nonsense?A Private Person's Inability to Recover if Defamed in Cyberspace (1999) 73 St. John's L.Rev. 829, 852-853; Wiener, Publication of Statements Posted on Electronic Bulletin Boards: Is There Any Liability left After Zeran? (1999) 39 Santa Clara L.Rev. 905 (but see Schruers, The History and Economics of ISP Liability for Third-Party Content (2002) 88 Va. L.Rev. 205 and Friedman & Buono, Limiting Tort Liability for Online Third-Party Content Under Section 230 of the Communications Act (1999-2000) 52 Fed. Comm.L.J. 647.)
[9] We do not believe this conflicts with the reliance on Zeran by another division of our District in Kathleen R. v. City of Livermore, supra, 87 Cal.App.4th 684, 692, 104 Cal. Rptr.2d 772 and by a panel of the Fourth District in Gentry v. eBay, supra, 99 Cal. App.4th 816, 830, 121 Cal.Rptr.2d 703. Neither of those opinions needed to address, and neither addresses, the question whether the immunity accorded under section 230 applies to distributor, as well as primary publisher, liability. Under the common law, the defendants in those cases would not have been liable as distributors.
[10] The statement in Zeran that distributor liability conflicts with the "explicitly stated" command of Congress (129 F.3d at p. 334) rests not only on the idea that distributor liability is merely a subset of publisher liability but also the statement in subdivision (e)(3) of section 230 that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." This language cannot be deemed an explicit statement that Congress abrogated distributor liability under the common law because it begs the question whether survival of distributor liability is inconsistent with section 230.
[11] Section 230's lack of clarity as to the boundary of the immunity it creates contrasts with the specificity of the immunity granted under the Digital Millennium Copyright Act (17 U.S.C. § 512) (DMCA). Like the CDA, the DMCA protects Internet service providers from liability for content provided by third parties. The DMCA immunizes providers who transmit material that infringes the rights of the holder of a copyright if the provider did not originate the infringing content, has no editorial control over the material, does not know the material is infringing or have reason to know, acts expeditiously to remove the material after learning of the infringement, and receives no financial benefit from the infringing activity. (17 U.S.C. § 512(a)-(d).) While the level of intermediary liability allowed under the DMCA is similar to distributor liability under the common law and may therefore indicate Congress does not feel this level of liability will unduly chill Internet communication, the greater significance of the DMCA for our purposes is its particularity as to the conditions and limits of the immunity it creates. Unlike the CDA, the DMCA "speaks directly" to this issue.
[12] Reno v. American Civil Liberties Union, supra, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 held that the provisions of the CDA calculated to achieve that purpose (47 U.S.C. §§ 223(a) and 223(d)), were contentbased restrictions on speech and facially overbroad in violation of the First Amendment.
[13] In Cubby a journalist claimed he was defamed by material posted on a CompuServe newsgroup for journalists. CompuServe had contracted with CCI requiring the latter to "manage, review, create, delete, edit, and otherwise control the contents" of the newsgroup. Another company, DFA, which had no direct relationship with CompuServe, agreed in a contract with CCI to provide part of the content, a publication called "Rumorville." In an issue of Rumorville posted on the CompuServe newsgroup site, DFA allegedly made defamatory comments about the plaintiff's competing newsgroup. Before the action was filed, CompuServe received no complaints about the Rumorville publication or about DFA. The Cubby court found that CompuServe "has no more editorial control over such a publication than does a public library, bookstore or newsstand, and it would be no more feasible for CompuServe to examine every publication it carries for potentially defamatory statements than it would be for any other distributor to do so." (Cubby, Inc. v. CompuServe, Inc., supra, 776 F.Supp. at p. 140.) Determining that CompuServe was in effect a distributor, and that the appropriate standard of liability was "whether it knew or had reason to know of the allegedly defamatory Rumorville statements," the court held that liability was barred by the absence of notice. (Id. at p. 141.)
[14] And at least one commentator who agrees that intermediary liability may chill online speech does not believe an absolute immunity is the appropriate response, because such a complete protection not only "ignores the power that the Internet gives irresponsible speakers to damage the reputations of their targets," but also "underestimates the benefits that defamation law may bring to Internet discourse." (Lidsky, Silencing John Doe: Defamation & Discourse in Cyberspace (2000) 49 Duke L.J. 855, 865.) Emphasizing that defamation law exerts a "civilizing influence" that makes meaningful public discourse possible (id. at p. 886, citing Post, The Social Foundations of Defamation Law: Reputation and the Constitution (1986) 74 Cal. L.Rev. 691, 713 and Post, Constitutional Domains (1995)), Professor Lidsky maintains that completely protecting Internet intermediaries who disseminate injurious speech deters citizens fearful of injury from engaging in Internet discourse and exacerbates "the largest single threat to meaningful discourse in cyberspace: incoherence." (Id. at p. 886) In her view, the better judicial approach would be to remedy the defects in defamation jurisprudence through a nuanced and more rigorous application of the constitutional privilege for nonfactual expression; that is, by adapting the "opinion privilege" to "the unique social context of cyberspace." (Id. at pp. 919-946.)
[15] A distributor is obliged to review messages from a particular source in advance of posting only when informed that a specified source is likely to communicate actionable messages. (Spence v. Flynt (D.Wyo.1986) 647 F.Supp. 1266, 1273.)
[16] "A person who wants to publish a message on an electronic bulletin board logs onto the bulletin board on his computer. The bulletin board or forum is actually a server accessible to persons logging on. The connection between the computers may be by direct telephone link, through a proprietary network, or through the Internet. The user either composes the message while he is connected to the service or uploads a previously composed message. The message may be immediately posted, i.e., made available on the server to persons with access to the bulletin board, or it may be delayed briefly to prevent the bulletin board from becoming a chat room, or it may be edited or refused publication. Nothing in the technology prevents the operator of an electronic bulletin board from reading every message before it is posted on the board; in fact in a moderated USENET newsgroup or listserv this is what happens." (Sheridan, Zeran v. AOL and the Effect of Section 230, supra, 61 Alb.L.Rev. at pp. 152-153, fns. omitted; see also Luftman, Defamation Liability for On-Line Services (1997) 65 Geo. Wash. L.Rev. 1071, 1075-1083; American Civil Liberties Union v. Reno, supra, 929 F.Supp. at pp. 833-835.) Due to such control, one commentator has opined that "the sysop [system operator] of a BBS [bulletin board system] could be held liable for torts committed within the BBS itself. If a defamatory message is posted thorough USENET to the much wider Internet newsgroup audience, the sysop could be liable for that as well. [¶] One of the important differences between commercial on-line services and BBSs is that the activity on the BBSs is often moderated by the sysop, who receives the messages and decides which ones to post to a given newsgroup The sysop screens off messages that are not topical or otherwise unacceptable. This distinction is crucial, since the amount of editorial control exercised by the sysop becomes the key factor in ascertaining the sysop's liability for users' torts." (Bovenzi, Liabilities of System Operators on the Internet (1996) 11 Berk. Tech. L.J. 93, 99, fns. omitted.)
[17] For example, proposals to give the press a privilege to repeat defamatory remarks, even when the publisher or broadcaster suspects or is convinced of their falsity (see, e.g. Sowle, Defamation and the First Amendment: The Case for a Constitutional Privilege of Fair Report (1979) 54 N.Y.U.L.Rev. 469), have been resisted on the ground of the immense potential for abuse of such a doctrine: "The pretexts for its exercise are bound to be trivialized. The occasion for its first judicial endorsement [in Edwards v. National Audubon Society (2d Cir.1977) 556 F.2d 113, which, in dicta, suggested a `right of neutral reportage'] was itself questionable. Should such a privilege to republish known or suspected falsehoods be generally recognized, the limitations on its exercise that initially served to justify it can be expected to be progressively eroded, as false exposes of only slightly different degrees of irresponsibility become increasingly difficult to be distinguished from each other. The ultimate contribution of such a privilege to the encouragement of yellow journalism is very likely to outweigh its contribution to democratic liberty. In the absence of a compelling need for it, the adoption of such a general privilege should be considered only with the utmost caution." (2 Harper et at, The Law of Torts (2d ed.1986) § 5.18 at pp. 153-155, fns. omitted.)

The controversial nature of limitations on liability for defamation are also evident in connection with the distinctive treatment accorded radio and television broadcasters, who are subject to liability as original publishers but immune from liability as distributors. (Rest.2d, Torts, § 581(2).) See, e.g., Krattenmaker & Powe, Converging First Amendment Principles for Converging Communications Media (1995) 104 Yale L.J. 1719, attacking "the silly notion that freedom of speech depends on the configuration of the speaker's voicebox," and arguing that "the general principles of law and regulation underlying all nonbroadcast mass media would be just as workable, and should be fully applied, to the broadcast media." (Id. at pp. 1719, 1740.)
[**] See footnote *, ante.